**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Fritznel REME and Fritz Pierrot,
Defendants-Appellants.**

**No. 83-5076.**

United States Court of Appeals,
Eleventh Circuit.

Aug. 9, 1984.

Rehearings Denied
Oct. 23 and Nov. 26, 1984.

Luis A. Fors, Miami, Fla., court appointed, for Reme.

Jose Batista, Reemberto Diaz, Hialeah, Fla., for Pierrott.

Stanley Marcus, U.S. Atty., Michael W. Burnbaum, Linda Collins-Hertz, Sonia Escobio O'Donnell, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, TJOFLAT and HENDERSON, Circuit Judges.

GODBOLD, Chief Judge:

Appellants Reme and Pierrot are two Haitian nationals who arrived in this country by boat along with approximately 80 of their countrymen. They were convicted by a jury on 14 counts of transporting the other Haitians to this country and on one count of conspiring to do so. They appeal, and Pierrot also challenges his sentence. We affirm the convictions but vacate Pierrot's sentence and remand to the district judge for a new sentencing hearing.

### I. FACTS AND PROCEDURAL HISTORY

On October 1, 1981, a primitive wooden sailboat 30 to 40 feet in length left Haiti for the United States with approximately 89 people on board, including appellants Reme and Pierrot. Three weeks later, after an arduous voyage, the boat landed at Miami Beach. The boat people were Haitian nationals without visas or other documents permitting their legal entry into the United States. As soon as the vessel landed those on board were rounded up by police and taken to a detention center and detained as illegal aliens.

On July 9, 1982, a grand jury returned a 15–count indictment against Pierrot, Reme, and eight others.[1] Count I charged them with conspiring to bring into and land in the United States 77 illegal aliens, in violation of 8 U.S.C. § 1324(a)(1) (1982) and 18

U.S.C. § 371 (1976). Counts II through XV charged all ten defendants with transporting, or attempting to transport, 14 named aliens into the country in violation of 8 U.S.C. § 1324(a)(1) (1982) and 18 U.S.C. § 2 (1976).

Pierrot's pretrial motion to dismiss the indictment for denial of speedy trial was denied. Pierrot filed another pretrial motion to prohibit the government from introducing evidence concerning an alleged voodoo ceremony that occurred during the voyage and culminated in the disappearance of two passengers. This motion was also denied, and the case proceeded to trial.

The government's case included the testimony of five Haitian nationals who had been passengers on the sailboat. Witness Clement testified that Pierrot was the captain. Rec. 4:8, 5:78. In describing Pierrot's control over the boat and its occupants, Clement related in some detail how Pierrot made the passengers sing voodoo songs, Rec. 4:43, 5:105, and submit to searches for valuables and black magic, Rec. 4:27, ordered and controlled the distribution of food, Rec. 6:234, and water, Rec. 5:95, on the boat, and how Reme, Rec. 5:21, and Pierrot, Rec. 5:74, beat the passengers. Both defendants took turns steering the boat, Rec. 4:10–13, and issued commands to the passengers. Rec. 4:15, 5:112. According to the testimony of Clement, Rec. 5:30, when the South Florida coast was sighted, Pierrot and two of the other defendants warned those on board:

"If anyone talks, that is their problem."

They said that if anyone talks, saying that there were more people aboard, that they would have problems and that they, themselves, would not be in trouble.

We should say that the boat does not have any captain, everyone is helping.

Pierrot gave similar warnings to the Haitians while they were at the detention center. Rec. 5:42.

---

1. Ten people were indicted: Jasmine, Ferdinand, Reme, Pierrot, Deronvil, Desdunes, Fils-Aime, Bertol, Pierre, and Saint Vil. Jasmine and Ferdinand are believed to have remained in Haiti and did not come to the United States on

the boat with the other defendants. Deronvil escaped from custody prior to trial. The remaining seven defendants were tried together, and only Pierrot and Reme were convicted.

Clement described a voodoo ceremony that led to the disappearance of the two missing passengers, Luc Alliance and Luc Vixamar. Prior to the voodoo rituals the boat's progress had been hindered by lack of wind. Pierrot had ascribed this to the presence of someone on the boat who had "black magic." Rec. 4:25–26. He threatened to throw overboard anyone with black magic. Rec. 6:258. Ultimately, searches of the passengers turned up black magic on Alliance, Rec. 4:52, and Vixamar, Rec. 4:31. After a conference between Pierrot and four of the defendants who were acquitted, the two men were ordered undressed and bathed in special water. Then, pleading for their lives, they were made to sit cross-legged facing each other. All passengers other than Pierrot, Reme, several of the other defendants, and Vixamar and Alliance were sent below deck and remained there for the night. Rec. 4:63, 66. When everyone awoke the next morning, Alliance and Vixamar were gone. Rec. 5:166.

The government's other Haitian witnesses essentially corroborated Clement's testimony. Witness Belizire testified that the boat had two captains, Pierrot and Reme. Rec. 6:331. Witness Accilien testified that he had seen Pierrot working for Jasmine, the owner of the sailboat, prior to when the Haitians departed for this country. Rec. 6:217. Witness Baptiste testified that Jasmine introduced him to Pierrot the day the boat was to leave Haiti. Rec. 6:371–72. Accilien also stated that both Reme and Pierrot beat the passengers. Rec. 6:237.

At the close of the government's case all defendants moved for judgments of acquittal, which were denied. Pierrot declined to put on evidence. Reme and several other defendants testified in their own behalf and called witnesses. Motions for acquittal

were renewed at the close of all the evidence and again denied. The jury found Reme and Pierrot guilty on all counts and acquitted the other five defendants.

Reme and Pierrot present several issues: (1) sufficiency of the evidence to support their convictions; (2) violation of Pierrot's speedy trial rights; (3) error in denying Pierrot's motion for mistrial; (4) abuse of discretion in denying Pierrot's motion for severance; (5) violation of Pierrot's right to a fair trial by the prosecutor's closing argument; and (6) denial of due process in the district court's reliance on hearsay concerning the voodoo murders in imposing Pierrot's sentence.

## II. SUFFICIENCY OF THE EVIDENCE

■ In reviewing sufficiency we must view the evidence in the light most favorable to the government and draw all reasonable inferences and make all credibility determinations in support of the jury's verdict. *Glasser v. U.S.*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The verdict is sufficiently supported if, so viewed, the evidence would permit a reasonable trier of fact to conclude that the defendant is guilty beyond a reasonable doubt. *U.S. v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. *Id.* & n. 3.

■ Reme's contention that the evidence required a conclusion that he was a paying passenger and therefore could not be guilty of conspiring to transport or attempting to transport aliens has no merit.[2] The Haiti-

**2.** The substantive statute, 8 U.S.C. § 1324(a) (1982), provides in relevant part:

Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through

another, to bring into or land in the United States, by any means of transportation or otherwise;

. . . . .

any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this

an passengers testified that Reme was one of the navigators. From this the jury could have inferred that he knew where the boat was headed and was attempting, in conjunction with Pierrot, to land the boat in the United States. The evidence established that none of the Haitians had papers permitting legal entry. These facts are sufficient to sustain Reme's conviction.

His assertion that he was simply a passenger is belied by the substantial control he exerted over the boat and its occupants. In addition to his navigation function Reme issued commands to the passengers and directed their movements on board. He spent the majority of the trip on the upper bridge area with the other defendants, while the passengers were ordered to remain below throughout almost the entire voyage. He beat passengers who failed to follow his commands. This evidence permitted reasonable jurors to conclude beyond a reasonable doubt that Reme was one of the principals in a smuggling operation and that his role was to help get the ship to the United States and to keep order on the boat during the trip.

■■ Even if Reme was not paid that would not render his conviction invalid. The statute does not require payment as an element of the offense, and lack of payment does not render the evidence insufficient as a matter of law. *U.S. v. Hanna*, 639 F.2d 192, 194 (5th Cir. Unit B 1980), *rehearing denied*, 639 F.2d 194 (5th Cir. Unit B 1981). The indictment did state that one of the objects and goals of the conspiracy was to transport aliens "for the purpose of obtaining money," but it included other objects as well.

It was further an object and goal of the conspiracy that the defendants would keep control over the Haitian alien passengers during the course of the voyage to the United States by use of force. There was overwhelming evidence that Reme shared in this object of the conspiracy.

chapter or any other law ... shall be guilty of

Reme contends that he did not possess any knowledge that he was involved in a smuggling operation. The government's proof concerning Reme's activities on the vessel and the absence of papers permitting legal entry constitutes sufficient evidence for a reasonable trier of fact to conclude beyond a reasonable doubt that Reme intended to transport aliens into the country and that he knew of their illegal status.

The conspiracy conviction requires proof of an agreement to commit the substantive offense. *U.S. v. Avila-Dominguez*, 610 F.2d 1266, 1271 (5th Cir.), *cert. denied sub nom. Perez v. U.S.*, 449 U.S. 887, 101 S.Ct. 242, 66 L.Ed.2d 113 (1980). Proof of Reme's agreement to commit the substantive offense is supplied by testimony that Pierrot and Reme jointly controlled the movements of both the boat and its passengers. From this evidence the jury could reasonably have inferred that Reme agreed with Pierrot to transport the illegal aliens to the United States.

■ Because Pierrot declined to put on any evidence in his own behalf, the government concedes that this court must evaluate the sufficiency of the evidence against him solely in terms of the proof presented in the government's case-in-chief. *See U.S. v. Belt*, 574 F.2d 1234, 1236–37 (5th Cir. 1978). The evidence against Pierrot is even stronger than that against Reme. Several of the government's witnesses linked him to the boat's owner. The evidence overwhelmingly suggests that Pierrot was the top person in command throughout the voyage. The evidence was sufficient to support his convictions.

Pierrot's argument that the government failed to prove intent to smuggle under § 1324(a)(1) is frivolous. As with Reme, the jury could reasonably have inferred that Pierrot was aware of the illegality of his actions and of the Haitian passengers' status as aliens not entitled to admission to the United States. In addition, the evidence showed that Pierrot had warned the passengers not to tell the authorities how

a felony....

they got to this country or who had brought them.

### III. SPEEDY TRIAL

#### A. *The Speedy Trial Act*

■ The Speedy Trial Act requires that [a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual *was arrested* or served with a summons *in connection with such charges.*

18 U.S.C. § 3161(b) (1976) (emphasis added). Pierrot argues that his arrest on October 21, 1981 required him to be indicted by November 20. The arrest, however, must have been "in connection with such charges."

> An arrest triggers the running of § 3161(b) of the Speedy Trial Act only if the arrest is for the same offense for which the accused is subsequently indicted .... The time limitation for indicting an accused does not begin to run if the accused is arrested for an unrelated offense.

*U.S. v. Brooks,* 670 F.2d 148, 151 (11th Cir.), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2943, 73 L.Ed.2d 1339 (1982). Pierrot's detention on October 21 was pursuant to the authority of the INS to confine the arriving Haitians as aliens who had unlawfully entered the United States. *See generally Jean v. Nelson,* 727 F.2d 957 (11th Cir. 1984) (en banc). It was only on July 15, 1982 that Pierrot was served by the U.S. Marshal with the warrant issued pursuant to the indictment. Because the arrest in connection with the charges did not occur until July, the Speedy Trial Act was not triggered until that time, and Pierrot's statutory claim fails.

#### B. *Sixth Amendment*

■ The protections of the Sixth Amendment are activated "only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution." *U.S. v. Marion,* 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971). An accusation has generally been considered to include only " 'a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge.' " *U.S. v. Lovasco,* 431 U.S. 783, 788, 97 S.Ct. 2044, 2048, (1977) (quoting *Marion,* 404 U.S. at 320, 92 S.Ct. at 463). When arrest is used as the basis for triggering the Sixth Amendment right to a speedy trial, however, " 'the basis for the arrest is critical.' " *U.S. v. Nixon,* 634 F.2d 306, 309 (5th Cir.1981) (quoting *Gravitt v. U.S.,* 523 F.2d 1211, 1215 n. 6 (5th Cir.1975) (emphasis in original)); *U.S. v. Avalos,* 541 F.2d 1100, 1109 (5th Cir.1976), *cert. denied,* 430 U.S. 970, 97 S.Ct. 1656, 52 L.Ed.2d 363 (1977).

In *Avalos* the government arrested the defendants on drug charges in Washington, D.C. and subsequently dismissed the charges in what the D.C. Circuit found was a deliberate attempt at forum shopping. The defendants were rearrested in Miami and tried there on the same drug charges. 541 F.2d at 1104–05. Because the activities forming the basis of the Miami conviction were the same as those for which the defendants were originally arrested in Washington, we held that the right to a speedy trial under the Sixth Amendment attached on the date of the initial arrests. *Id.* at 1109.

The opposite result occurred in *Nixon,* where the defendant was originally arrested for counterfeiting. When evidence necessary to convict was not forthcoming, the prosecution dismissed the charges. Seeking to revitalize the case, the government empaneled a grand jury, which called the defendant as a witness. In his testimony before the grand jury the defendant denied all involvement in counterfeiting. Over a year later additional evidence was discovered that demonstrated defendant's complicity in the counterfeiting scheme. The defendant's false answers before the grand jury served as the basis for his subsequent indictment and conviction for perjury. 634 F.2d at 307–08. The court found no Sixth Amendment violation because Nixon's

speedy trial rights did not attach until the indictment for perjury.

A speedy trial claim as to each separate offense must stand or fall on its own merits, based upon when the defendant was accused, by arrest or indictment, *of that specific offense.*

*Id.* at 309 (emphasis added).

■ Here Pierrot was being detained as an illegal alien when he was indicted for the offenses of which he was convicted. We have considered an analogous situation in the context of Sixth Amendment claims by prison inmates who have committed additional crimes while in prison. *See U.S. v. Manetta,* 551 F.2d 1352 (5th Cir.1977); *U.S. v. Duke,* 527 F.2d 386 (5th Cir.), *cert. denied,* 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1190 (1976). Even where the prisoner has been disciplined with administrative segregation for his actions, we have found that there has been no "accusation" that triggers the Sixth Amendment until an indictment has been handed down or formal charges otherwise filed. *Manetta,* 551 F.2d at 1354; *Duke,* 527 F.2d at 388–90. Pierrot and some of the other Haitians were transferred from the detention center to a federal correctional facility, but the record does not reveal the reason. Assuming that Pierrot's transfer was related to the discovery by immigration authorities of his involvement in the transporting conspiracy, however, under *Manetta* and *Duke* the transfer would not constitute an "accusation" that would trigger the Sixth Amendment. We conclude that the Sixth Amendment has no bearing on Pierrot's claim of delay in bringing the indictment.

## C. *Fifth Amendment Due Process*

■ Although no constitutional right to a speedy trial attaches prior to "accusation,"

> *preaccusation* delay may violate the due process guarantee of the fifth amendment if two factors can be shown: (1) the defendant incurred substantial prejudice as a result of the delay, and (2) the government intentionally delayed in order to gain a tactical advantage.

*U.S. v. Radue,* 707 F.2d 493, 495 (11th Cir.) (per curiam) (emphasis in original), *cert. denied,* —— U.S. ——, 104 S.Ct. 281, 78 L.Ed.2d 259 (1983); *see Marion,* 404 U.S. at 322–25, 92 S.Ct. at 464–466. Even where the defendant has been prejudiced by preaccusation delay, if it is investigative delay the defendant has not been deprived of due process. *Lovasco,* 431 U.S. at 796, 97 S.Ct. at 2052. Despite Pierrot's contention to the contrary, there is nothing in the record to indicate that the nine-month delay was "an intentional device to gain tactical advantage over the accused." *Marion,* 404 U.S. at 324, 92 S.Ct. at 465. As the Supreme Court has made clear, prosecutors do not violate fundamental fairness when they defer seeking indictments until they have probable cause to believe an accused is guilty. *Lovasco,* 431 U.S. at 790–91, 97 S.Ct. at 2048–2049. Likewise, "prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." *Id.* at 791, 97 S.Ct. at 2049.

■ Here, 77 illegal aliens washed up on the beach. It was only after they were detained and questioned by immigration authorities that it was discovered that Pierrot and others probably had some role in their transportation to this country. In assessing the reasonableness of the length of the investigation we consider that there were multiple defendants, most of whom went by nicknames, and that the passengers on the boat had been warned by Pierrot not to tell the authorities anything. The nine-month delay was not unreasonable in light of the complexity of the case, and Pierrot has fallen far short of showing any tactical reason for the delay.

His allegations of prejudice are equally conclusory and insufficient. He suggests that the delay has caused the absence "of all possible favorable witnesses," and says that he does not now know their whereabouts. He does not name any specific potential witnesses who might have aided his defense; he has not stated what their expected testimony would be or how it

would have been material to his defense. Because he was present on the boat during all of the events that were the basis for the government's case, we can expect Pierrot to have first-hand knowledge of this information. In short, his allegations of prejudice are speculative, and therefore insufficient to merit relief. *Manetta,* 551 F.2d at 1354.

### D. *Rule 48(b)*

██ Rule 48(b) of the Federal Rules of Criminal Procedure provides:

If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint.

In *Lovasco,* the Supreme Court indicated that Rule 48(b) is " 'limited to post-arrest situations.' " 431 U.S. at 789 n. 8, 97 S.Ct. at 2048 n. 8 (quoting *Marion,* 404 U.S. at 319, 92 S.Ct. at 463). As we noted with respect to Pierrot's claims under the Sixth Amendment and the Speedy Trial Act, the arrest must be the one for which the defendant seeks the indictment dismissed, otherwise any delay is unrelated to the relief requested. Thus this is not a "post-arrest situation" to which Rule 48(b) applies.

### IV. ADMISSION OF VOODOO EVIDENCE

██ The trial court did not abuse its discretion in admitting evidence of the voodoo ceremony and the disappearances of Vixamar and Alliance. *See U.S. v. Russell,* 703 F.2d 1243, 1249 (11th Cir.1983). To prove the offenses charged the prosecution had to show that Pierrot was more than simply a passenger who steered the boat from time to time. The government had to convince the jury that he was in control of the transporting scheme, a smuggler rather than a passenger. In addition, this evidence had to be sufficient to prove the elements of conspiracy, including the

agreement to commit the substantive offense.

When the voodoo evidence was offered, the defense took the position that it was merely cumulative proof of control that was unnecessary to the government's case; at the same time, however, the defense was unwilling to stipulate that the government had proven control. The evidence concerning the searches for black magic and the treatment of the two missing men was strongly probative on the question of whether all of the defendants were in control of the vessel, or whether they were simply passengers. We find that the evidence was admissible under Fed.R.Evid. 404(b) to show control.

Pierrot argues that whether or not the voodoo evidence is admissible under Rule 404(b), its probative value is outweighed by its prejudicial effect, and under Fed.R.Evid. 403, it must be excluded. Although we recognize the potential for prejudice that this evidence presented, the district judge carefully and properly considered this question and held the testimony concerning the voodoo ceremony admissible.

As previously noted, this evidence was highly probative on the issue of control as to all of the defendants. Their common defense was that they were just passengers. Their participation in steering the boat, cooking the food, managing the distribution of water, and the other activities described by the government's witnesses was explained as something necessitated by their situation. These activities could have been attributed to necessity or altruism as well as to their alleged involvement in a conspiracy to transport illegal aliens to the United States. The "passenger defense" was rendered less credible by the evidence of the defendants' participation in disciplining passengers and searching them for black magic and valuables.

Against this probative value we weigh the prejudicial effect of the evidence. Throughout the trial the judge repeatedly cautioned the jury concerning the limited purpose for which the evidence was admitted. The jury charge contained three and a

half pages of instructions reminding the jury of the limited basis of admissibility of the evidence, including an instruction that the case had nothing to do with voodoo or religion or the religious beliefs of the defendants or their passengers. Under these circumstances, we cannot say that it was an abuse of discretion to admit the evidence.

Finally, the jury's verdict tends to show that the voodoo evidence was not given undue weight. Although the testimony established some participation by all defendants in the voodoo ceremonies and in the disappearance of Vixamar and Alliance, everyone was acquitted except Reme and Pierrot. This indicates that the jurors weighed the evidence against each defendant and did not use mere participation in the voodoo rites as a basis to convict.

■ We also reject Pierrot's contention that admission of the evidence concerning the disappearances violated his right to a fair trial by placing him in a position where he had to forego his Fifth Amendment right against self-incrimination if he wished to testify in his own behalf. He cites cases involving compelled testimony of grand jury witnesses who faced potential prosecution for offenses that were the subject of their grand jury testimony. *See, e.g., Zicarelli v. New Jersey State Commission of Investigation*, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972); *U.S. v. Field*, 532 F.2d 404 (5th Cir.), *cert. denied*, 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976). These cases are inapposite because they involve compelled testimony. Pierrot was under no compulsion to testify about the disappearances and was in no different position than any defendant is in deciding whether to take the stand and face cross-examination on past offenses for which there has been no prosecution. He had the choice whether to testify at all.

## V. SEVERANCE

■ Pierrot contends that the trial judge erred in refusing to grant his motion for a severance. A motion for severance under Fed.R.Crim.P. 14 is a matter for the sound discretion of the trial judge. *U.S. v. Berkowitz*, 662 F.2d 1127, 1132 (5th Cir. Unit B 1981). The general rule, as Pierrot acknowledges, is that defendants who are jointly indicted should be tried together, and this rule applies with particular force in conspiracy cases. *U.S. v. Howell*, 664 F.2d 101, 106 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 1005, 102 S.Ct. 1641, 71 L.Ed.2d 873 (1982). To obtain a severance on grounds of conflicting defenses a defendant must show that the defenses are not merely facially inconsistent but that they are mutually exclusive and irreconcilable. *Berkowitz*, 662 F.2d at 1133.

The district court did not abuse its discretion in denying Pierrot's motion for severance. All defendants made substantially the same defense that each was a passenger who desired to reach this country, and that, if he steered or beat others, it was to facilitate his own arrival in Miami and to do as much along the way for the others as he could. Although Pierrot did not put on any evidence in defense, this is essentially what his attorney argued to the jury on his behalf. This theory of defense is not mutually exclusive or irreconcilable with the defenses of his co-defendants, as required under *Berkowitz*.

## VI. PROSECUTORIAL MISCONDUCT

■ The prosecutor argued to the jury:

Remember [witness] Paulince Clement. Paulince Clement, as Cleoma [Saint Vil] helps bring Luc Vixamar up to the top, Paulince Clement told us about what Luc Vixamar was doing on his knees, on his hands and knees, as Cleoma brings him up. .

And picture it, if you will, on the upper deck as you look at the photographs [of the boat], and Luc Vixamar standing and pleading for his life and pleading, "What did I do?"

Because we have already held that evidence of the voodoo ceremony and the disappearances was admissible to prove control, arguably the comment by the prosecutor was not improper. Even assuming it

was improper, however, an objection followed the argument, and the judge immediately instructed the jury to disregard everything about the ceremony and disappearances except as they went to prove control and involvement in the conspiracy.

To warrant a new trial, improper prosecutorial comment must prejudicially affect substantial rights of the accused. *U.S. v. Kopituk,* 690 F.2d 1289 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983). In determining the prejudicial impact of improper remarks we must also consider any jury instructions given and their likely effect in reducing the prejudice. *U.S. v. Rodriguez,* 585 F.2d 1234, 1244 (5th Cir.1978), *cert. denied sub nom. Albernaz v. U.S.,* 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980). We find that the trial judge's admonition to disregard was adequate to control the jury's reaction to the prosecutor's argument. We have reviewed the record on Pierrot's other contentions about prosecutorial misconduct and find them to be without merit.

## VII. SENTENCING

At the sentencing hearing the prosecution repeatedly argued that the voodoo disappearances were a factor that mandated severe sentences. The prosecutor requested sentences of 50 years for Pierrot and 10 years for Reme. The trial judge noted that two years was the average sentence for the charged offense in the United States, with 10 months the average in the Southern District of Florida. The court further indi-

cated its concern that the defendants were to be sentenced for the crimes of conspiracy and transporting aliens, not for murder,[3] and that the evidence presented at trial on the defendants' participation in the so-called murders had been far from clear on their guilt.[4]

In response to the district court's concerns the government introduced the testimony of Agent Peterson of INS. Peterson recounted conversations he had had with one of the Haitian witnesses, Baptiste, and with Aguilar, the attorney for Pierrot's co-defendant Pierre. Peterson stated that Pierre had confided in his attorney, Aguilar, that Pierrot had thrown Vixamar and Alliance overboard. Peterson said he had learned of this from Aguilar. Agent Peterson also testified that Baptiste had told him the same thing, that Pierrot had pushed one of the men over, and then, with the assistance of Fils-Aime (one of Pierrot's co-defendants who had been acquitted), Pierrot then threw the second man over the side. Baptiste had testified under oath at trial, however, that he did not see how the two men disappeared. In addition, to avoid having to grant a mistrial or a severance, the court at trial had prevented co-defendant Pierre from testifying about the identity of the person(s) who had thrown the men overboard. Thus there was no trial testimony under oath by any eyewitness that Pierrot threw the men overboard.

After considering Agent Peterson's testimony, the trial judge concluded:

3. At the sentencing hearing, the court stated:
   These people were not tried for murder. They were tried for smuggling aliens. That is what they are to be sentenced for. They are not here to be sentenced for murder. They are here to be sentenced for smuggling aliens. Rec. 21:4. The district judge asked the prosecutor:
   [D]o you know of any case—I'm not aware of any—that says I can sentence them for crimes other than those they are charged with. I mean you can't take a man for this charge of smuggling and sentence him for murder. Rec. 21:13.
   You don't sentence a person for commission of other crimes that the government ei-

ther could not or did not, usually could not, but could not prosecute a person for. Rec. 21:16.

4. The court noted that
   the evidence is not clear; it is far from clear as to who did that—the evidence I think reflects that a group of people caused the death of the person who was selected for throwing overboard to appease the voodoo gods.
   Certainly there is evidence that a person was thrown overboard or jumped overboard or whatever happened to him, but the evidence is far from clear in my memory of the trial as to who did that. Rec. 21:17–18.

[I]ndeed and in fact Fritz Pierrot caused the murder or actually murdered and caused the death of the two individuals who lost their lives on this voyage by being, one, pushed overboard, and the other picked up and thrown bodily overboard at night after the voodoo ceremony.

Rec. 21:51. The court further ruled that "[u]nder these circumstances I think that consideration should be given to the murder by Fritz Pierrot of these two individuals." Rec. 21:52. The judge then sentenced Pierrot to 30 years in prison (five years on each of Counts I through VI, to be served consecutively, and five years each on Counts VII through XV, to be served concurrently) and Reme to five years (five years each on Counts I through XV, to be served concurrently). The question presented is whether, in light of the conflicting evidence, the trial judge's reliance on the agent's hearsay testimony as justification for imposing a sentence many times more severe than the average sentence constituted a denial of due process. We hold that it did.

■ The district judge has broad discretion in the imposition of criminal sentences. *U.S. v. Small*, 636 F.2d 126, 127 (5th Cir. Unit B 1981). The severity of a sentence imposed within the statutory limits is insulated from appellate review, but the judicial process by which a sentence is determined is subject to appellate scrutiny. *U.S. v. Clements*, 634 F.2d 183, 186 (5th Cir.1981).

■ Congress has given the district courts extensive latitude in the information that they can consider in making sentencing determinations.

No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3577 (1976). A defendant is not denied due process of law when a judge considers out-of-court information in determining sentence, *Williams v. New York*, 337 U.S. 241, 246, 250–51, 69 S.Ct. 1079, 1084–1085, 93 L.Ed. 1337 (1949), so long as the defendant is afforded an opportunity to refute it, and it is reliable, *U.S. v. Ammirato*, 670 F.2d 552, 557 (5th Cir. Unit B 1982). The hearsay evidence relied on at sentencing must bear minimal indicia of reliability if the defendant's right to due process is to be preserved. *U.S. v. Baylin*, 696 F.2d 1030, 1040 (3d Cir.1982); *U.S. v. Weston*, 448 F.2d 626, 634 (9th Cir.), *cert. denied*, 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 249 (1972).

■ Where a defendant claims that his due process rights have been violated by the sentencing court's reliance on false or unreliable information, he must make a showing of two elements: (1) that the challenged evidence is materially false or unreliable, and (2) that it actually served as the basis for the sentence. *See Clements*, 634 F.2d at 186 (initial burden of showing reliance on the challenged evidence); *U.S. v. Ching*, 682 F.2d 799, 801 (9th Cir.1982) (two prong test: defendant must show reliance and falsity or unreliability). If the defendant carries this burden, the proper remedy is a remand to the district court for a new sentencing hearing. *U.S. v. Tobias*, 662 F.2d 381, 388 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982); *U.S. v. Battaglia*, 478 F.2d 854 (5th Cir.1972) (per curiam).

■ Pierrot has satisfied his initial burden of showing that the district court expressly based its sentence on the hearsay statements in the INS agent's testimony. Before the government put Peterson on the stand, the court had stated that the evidence was not at all clear on who had thrown the two men overboard. *See supra* note 4. After hearing Peterson's testimony, however, the trial judge found as a fact that Pierrot had caused the deaths of Vixamar and Alliance.[5] Thus the hearsay testi-

5. In imposing sentence the court stated:

The Court concludes that indeed and in fact Fritz Pierrot caused the murder or actually

mony was the salient factor in the court's determination to impose the 30-year sentence.

The remaining question is whether the hearsay testimony was so unreliable that it would violate due process for the district court to have used it as the basis for Pierrot's sentence. We conclude that it was.

"Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Otherwise there must be a showing of "particularized guarantees of trustworthiness." *Id.* Where a declarant's statements were originally made in a situation that encompassed trial-type protections such as oath, defendant's opportunity to cross-examine, or the factfinder's chance to observe declarant's demeanor, evidence including such hearsay statements is more likely to be trustworthy and reliable. *See id.* at 69–74, 100 S.Ct. at 2540–2543. Likewise, where the declarant's statements were spontaneous, or against his own penal interest, *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970) (plurality opinion), they bear sufficient indicia of reliability to serve as a basis for sentencing. Whether the hearsay statement is corroborated or contradicted by other evidence in the record is also relevant in determining reliability. *U.S. v. Penn,* 721 F.2d 762, 765 (11th Cir. 1983).

The hearsay statements contained in Agent Peterson's testimony lacked these indicia of reliability and were largely contradicted by other evidence in the trial record. Both Pierre and Baptiste had testi-

fied at trial, under oath, subject to cross-examination, giving the trial judge an opportunity to observe their demeanor. Baptiste's trial testimony was that he had not seen who had thrown the two men overboard. Pierre did not testify on this subject. Both of these declarants had also given sworn statements to the INS within days of their apprehension on Miami Beach. Those sworn statements denied knowledge of how the two men had disappeared or who had caused their disappearance. All of these previous denials contradicted the statements contained in Agent Peterson's testimony, and only the denials bore indicia of reliability such as oath and opportunity to cross-examine.

The declarants' earlier testimony was not the only evidence contradicting Agent Peterson's testimony. At the sentencing hearing Pierrot's attorney argued that the October 1981 post-detention interviews of the Haitian passengers turned up accusations by several of them that it was Pierrot's co-defendant Pierre who had thrown the two men overboard. Those statements, like the interviews with Pierre and Baptiste at that time, followed closely on the events at issue and were more likely to be based on fresh recollections. "[S]ubstantial contemporaneity of event and statement negative[s] the likelihood of deliberate or conscious misrepresentation." Fed.R.Evid. 803 advisory committee note. The statements testified to by Agent Peterson occurred approximately one year after the voyage.

Neither of the statements was against penal interest, and Pierre's was self-serv-

---

murdered and caused the death of the two individuals who lost their lives on this voyage by being, one, pushed overboard, and the other picked up and thrown bodily overboard at night after the voodoo ceremony.

. . . .

Under these circumstances I think that consideration should be given to the murder by Fritz Pierrot of these two individuals.

Under these circumstances it is appropriate to go beyond the national average of two years, which is the national average for or national sentence, and the Southern District average which is ten months.

. . . .

I am stating my reasons and rationale for the sentence so it will be clear that this sentence is more severe than would otherwise have been were the Court not persuaded that Fritz Pierrot caused the murder of two of the passengers on the vessel.

If I am in error in considering that fact and imposing this sentence the Eleventh Circuit will of course tell me so, and then I will take whatever steps are indicated by their opinion. Rec. 21:51–53.

ing. Peterson testified that he learned during the course of plea negotiations in the midst of the trial that Pierre was accusing Pierrot of throwing the men overboard. This came out during a plea meeting between the prosecutor, Aguilar (Pierre's attorney), and Peterson. In light of Pierre's substantial motive to shift the blame to one of his co-defendants, his accusation of Pierrot raises obvious reliability problems.

Corroboration is also lacking. As previously noted, none of the sworn statements of these two declarants coincides with the story Agent Peterson told at sentencing. None of the Haitian witnesses who testified for the government at trial said he saw who threw Vixamar and Alliance overboard. Nothing in the trial record confirms the declarants' story that Pierrot killed Vixamar and Alliance.

The government argued at sentencing that the declarants' stories corroborated each other, but we find this unpersuasive. Had both declarants testified below, we could compare the two stories and determine whether and to what degree they corroborated each other. In the present posture, however, all we have is Agent Peterson's testimony that the story told him by Aguilar during plea negotiations recounted the same history of events as that laid out by Baptiste after the trial.[6] Since all hinges on Peterson's view of the two stories, this is not the sort of external confirmation that would aid in the determination of whether a given hearsay statement is corroborated, and hence, reliable. We hold that the district court denied Pierrot due process in resting his 30-year sentence upon the hearsay declarations contained in Agent Peterson's testimony.[7] We vacate Pierrot's sentence and remand to the district court for a new sentencing hearing.

This is not to say that hearsay is generally unreliable at sentencing proceedings. We only hold that in the narrow confines of this case, where so many indicia of unreliability existed, where the district court imposed a sentence far out of keeping with the local and national averages, and where it was the hearsay that triggered that sentence, the defendant was deprived of due process.

The convictions of Reme and Pierrot are AFFIRMED; we VACATE Pierrot's sentences and REMAND to the district court for a new sentencing hearing.

---

6. As defendant Pierrot's attorney argued below, there may have been opportunities for fabrication between the two declarants. Baptiste, a government witness, took the stand at trial and testified on Pierre's behalf as a defense witness. Aguilar then had the opportunity to question Baptiste about his story of the disappearances and to discuss with his client Pierre the answers given by Baptist.

7. Agent Peterson testified that Baptiste and Pierre could not be located at their last known addresses to obtain their appearances at the sentencing proceeding. Pierrot's attorney challenged the finding that they were unavailable. Whether the declarants were unavailable is irrelevant, however, to the determination of the reliability of the hearsay statements. Fed.R. Evid. 804(b)(5), which deals with hearsay exceptions for unavailable witnesses, still requires circumstantial guarantees of trustworthiness when the declarant is unavailable. Although the hearsay rules do not apply at sentencing, *see* Fed.R.Evid. 1101(d)(3), Rule 804(b)(5) indicates that reliability is an issue separate and apart from availability.