**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-13158

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

MICHAEL HUBBARD,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cr-00388-MLB-1

_____

Before NEWSOM, GRANT, and HULL, Circuit Judges.

PER CURIAM:

Michael Hubbard appeals the district court's September 18, 2024 revocation of his supervised release on his 2021 stolen-firearm conviction. After revoking, the district court

resentenced Hubbard to 24 months of imprisonment followed by 12 months of supervised release. On appeal, Hubbard argues, *inter alia*, that during the revocation hearing the district court erred and violated his due process rights by admitting and relying on hearsay statements in two police body-camera videos to find that Hubbard committed felony family violence battery.

After careful review, we conclude that Hubbard has shown no reversible error. We thus affirm the district court's revocation of Hubbard's supervised release and the resulting new sentence.

## I. JURISDICTION

As of September 12, 2025, Hubbard is no longer in federal custody on his new 24-month prison sentence. A sentencing appeal is generally moot once that sentence is completed. *United States v. Farmer*, 923 F.2d 1557, 1568 (11th Cir. 1991). "[T]he question of mootness is jurisdictional in nature." *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1329, 1331-32 (11th Cir. 2005). We are thus obligated to review *sua sponte* whether we have jurisdiction in the appellate process. *United States v. Lopez*, 562 F.3d 1309, 1311 (11th Cir. 2009).

Here, Hubbard is still serving his 12-month term of supervised release, which is part of his new sentence and involves some restrictions upon his liberty. Success for Hubbard on appeal could vacate his revocation and new sentence; thus, his appeal is not moot. *See Dawson v. Scott*, 50 F.3d 884, 886 n.2 (11th Cir. 1995). Therefore, we have jurisdiction over Hubbard's appeal.

## II.  BACKGROUND

### A.    2021 Stolen-Firearm Conviction

In October 2021, the United States Attorney charged Hubbard with possession of a stolen firearm, in violation of 18 U.S.C. §§ 922(j), 924(a)(2).  On October 4, 2021, Hubbard waived his right to an indictment and pled guilty.  The district court sentenced Hubbard to 70 months of imprisonment followed by 3 years of supervised release.  On July 3, 2023, Hubbard was released from federal custody and began serving three years of supervised release.

### B.    2024 Petition to Revoke

On January 18, 2024, Hubbard's probation officer filed a "Violation Report" and "Petition for Warrant" (collectively the "petition"), alleging that Hubbard had violated three conditions of his supervised release.  Specifically, the petition alleged that Hubbard (1) committed new Georgia offenses—"Simple Battery-Family Violence" in September 2023 and first-degree burglary, theft by taking, and willful obstruction of a law enforcement officer in December 2023 ("Violation One"); (2) unlawfully used marijuana twice in July 2023 ("Violation Two"); and (3) failed to report to his probation officer twice between October and December 2023 ("Violation Three").

Hubbard did not contest his failures to report in Violation Three.  The district court found the government did not prove Violation Two.  This appeal thus focuses on the district court's rulings as to Violation One.

### C.    Violation One in the Petition

Violation One alleged Hubbard committed new offenses against two female victims.  In September 2023, Hubbard allegedly committed simple battery family violence against Jasmine Webb, the mother of his son, by punching her in the face and grabbing her by her hair.  During the incident, Hubbard retrieved a firearm from his truck, put it in his waistband, and approached Webb.

In December 2023, Hubbard allegedly committed burglary and theft by taking when he entered the apartment of Ashley Douglas without permission, took her car keys, and drove away with her car.  Officers discovered Hubbard sleeping inside Douglas's car and told him to exit the vehicle.  Hubbard tried to flee on foot, resulting in an officer tasing him.

In July 2024, the probation officer amended the petition to note the simple battery family violence case was dismissed because the State's witness did not appear.

### D.    July and September 2024 Revocation Hearings

In July 2024, the district court held a revocation hearing. Hubbard sought to fire his appointed attorney and hire new counsel.  The court granted Hubbard's request.  As part of Violation One, the government told Hubbard and the court that it would pursue Hubbard's family violence battery as a felony and his firearm possession in the Webb incident.

On September 18, 2024, the district court held a final revocation hearing.  The government introduced police reports

and body-camera videos from the officers who responded to the Webb and Douglas incidents alleged in Violation One. The videos captured statements made by the officers and the victims. The admission of these recorded statements is the focus of Hubbard's appeal. So, we outline in detail these statements in the videos.

### E.    Body-Camera Video of September 2023 Webb Incident

At around 9:30 p.m. on September 2, 2023, Officer Gabriel Gaescudero-Suarez exited his vehicle and, using a flashlight, approached Webb. Standing in a residential yard, Webb stated that she called the police because of an encounter with her son's father, "Michael Hubbard," around 8:15 p.m. Webb and her son had driven to a family member's house to speak with her uncle.

As Webb spoke with her uncle, Hubbard approached and spoke to her son. Hubbard took her son's cell phone and argued with Webb when she requested its return. Webb explained to Hubbard that she wanted the phone back so she and her son could leave, as she knew that Hubbard had "a problem" where he would "just flip." Webb stated to Gaescudero-Suarez that when she and her son walked back to her car, Hubbard followed them and started to act aggressively.

Webb admitted to Gaescudero-Suarez that she had a pistol in her purse during the incident. As she and her son walked to her car, Webb clutched her purse because she and Hubbard had "a history of domestic violence" and she was "scared" of him. After taunting Webb about her concealed firearm, Hubbard walked to the trunk of his car. Webb's son was "scared" and begged Webb

to get into her car.  Once inside her car, Webb started pulling out of the driveway but stopped to take a picture of Hubbard's license plate.  When Hubbard noticed that Webb was taking the photo, he came over to her and punched Webb in the left side of her face, near her ear.

Gaescudero-Suarez increased the brightness of his flashlight and shined it where Webb indicated on her face.  Due to the bright lighting, the body camera rendered that area of Webb's face nearly completely white, such that any injury is indecipherable.

Webb then further stated that (1) when Hubbard punched her, she started laughing because they had a "history of this"; (2) after Hubbard picked up Webb's phone (from where he had knocked it on the ground) and tossed it in her car, Webb tried to drive away, only for Hubbard to grab—and ultimately pull out—a patch of Webb's hair from the back of her head; and (3) throughout this encounter at Webb's car, Hubbard had a gun that he had retrieved from his vehicle tucked into his waistband.  Webb admitted that she stopped the car, pulled out her gun, and pointed it at Hubbard.  She had been dealing with Hubbard "putting his hands on [her]" for the last 12 years, and she was tired of the abuse.

Webb stated that she wanted to file a police report because she did not want to interact with Hubbard, yet he continued to "terrorize" her.  When asked, Webb confirmed that Hubbard never pulled out his own gun, brandished it, or pointed it at her.  Gaescudero-Suarez explained that to charge Hubbard with aggravated assault, Hubbard would had to have pointed the gun at

her.  Webb appeared visibly frustrated, asking whether this meant that she could no longer file a report or "do anything about him." Gaescudero-Suarez indicated that Webb still could report that Hubbard punched her in her face and grabbed her hair, and Webb agreed to file a report.

Gaescudero-Suarez returned to his vehicle and contacted his supervising officer.  Gaescudero-Suarez reported that Webb "seem[ed] fine," and that Webb did not "really have any markings left" from being punched in the face.  Gaescudero-Suarez looked at the area where Hubbard had allegedly hit Webb and "she [did]n't have anything."

Gaescudero-Suarez then radioed a domestic violence detective and summarized Webb's report.  When asked by the detective if Webb had any injuries to her face, Gaescudero-Suarez stated that Webb did "have a little bit of redness" on the side of her face and her ear, such that "her ear [was] kinda red," but she had no lacerations.  As to Webb's hair, Gaescudero-Suarez admitted that he did not ask Webb to show him the specific patch of hair that Hubbard allegedly ripped out.

Gaescudero-Suarez's police report is consistent with his body-camera video.  Gaescudero-Suarez listed the offense as "Simple Assault" and reported Webb had "[s]uperficial [i]njuries." Later in the report, Gaescudero-Suarez reported that Webb had an "[a]pparent [m]inor [i]njury" on her left cheek, describing the injury as "[r]edness" after having been "[p]unched on the face."

**F.     Body-Camera Video of December 2023 Douglas Incident**

On December 31, 2023, in a parking lot, Officer Ocean Taylor approached Officer David Washington and a woman later identified as Douglas. They all stood in the parking lot of an apartment building, discussing Douglas's stolen vehicle. Douglas stated that her vehicle and the man who took it, later identified as Hubbard, were nearby in the parking lot. Hubbard stole her vehicle by entering her home while she was out and taking her spare car key without her permission. Douglas knew Hubbard had taken her car because, earlier that evening, she saw on her video doorbell camera that he had entered her home without her permission.

Officer Taylor and Douglas drove around the apartment complex looking for Douglas's car. Once located, Officers Taylor and Washington exited their vehicles and approached Douglas's car. Taylor radioed that Hubbard appeared to be asleep in the front seat of the vehicle. After instructing Hubbard to roll the driver's door window down, Washington informed him that he was "not in trouble" but he needed to turn the car off, open the door, and exit the vehicle so that they could talk.

After the officers repeated their instructions multiple times, Hubbard exited the vehicle. The officers directed Hubbard to turn towards the vehicle and put his hands behind his back, and then Taylor attempted to handcuff him. When Hubbard immediately started to struggle to escape both officers' grip and flee, Washington told him, "Don't do it!" Having slipped Taylor's

grasp, Hubbard continued to struggle with Washington, who continued to tell Hubbard, "Don't! Don't do it!" until Taylor deployed her taser. Washington then held Hubbard down and repeatedly told him, "I said 'Don't do it!,'" as Taylor handcuffed him.

Washington's and Taylor's police reports are consistent with Taylor's body-camera video. Taylor's report stated that Hubbard committed felony burglary, and felony theft by taking against Douglas, as well as misdemeanor obstruction by hindering a law enforcement officer.

## G.    Probation Officer's Testimony

The government then called Probation Officer Michelle Robinson, who testified she supervised Hubbard and wrote the amended violation report. Upon his release from prison in September 2023, Hubbard initially lived with Douglas. In July 2024, Robinson served Douglas with a subpoena at her home and learned that Douglas had kicked Hubbard out. During Robinson's visit, Douglas shared that, on the night of the December 2023 incident, she called the police because she and Hubbard had gotten into a "physical altercation," but she was "afraid" to tell the police as much, so she "just told them that he stole [her] car."

Robinson twice unsuccessfully attempted to serve subpoenas on Webb. The address in the first attempt did not belong to Webb. During her second attempt at a different address, Robinson spoke to a man in a car outside the address, and he called Webb on her behalf. Robinson overheard the man informing

Webb that "Hubbard's probation officer" was there to serve her with papers so that she could "snitch" on him. Webb responded that she had "already told them [she] didn't want to have anything to do with this." Robinson assumed that Webb was referring to Atlanta Police Department officers.

## H.    Hubbard's Objections to the Admission of Statements in the Police Body-Camera Videos and Police Reports

At the final revocation hearing, Hubbard objected to the admission of the police reports and the recorded statements in the body-camera videos as hearsay. Hubbard asserted that, under *United States v. Frazier*, 26 F.3d 110, 114 (11th Cir. 1994), the district court may rely on such hearsay evidence only after determining that the government's reason for not calling a declarant as a witness outweighed his right to confront the declarant.

The government explained that it was not calling the officers because there was "nothing more that the officer[s] could add to [the case] that wouldn't be captured on the body camera." It was not calling Webb or Douglas because (1) as shown by his prior convictions, Hubbard had subjected them to "systemic domestic violence," and (2) Hubbard's right to confront the victims did not outweigh the fact that they would be "put through the trauma that they've already experienced at this defendant's hands."[1]

---

[1] As to Webb, Hubbard was convicted (1) in 2012 for family violence battery and two counts of third-degree cruelty to children, for having caused visible bodily harm to Webb in front of two children; (2) in 2013 for a 2012 felony robbery by force, felony aggravated assault, battery, and third-degree cruelty

The government further stated that it had unsuccessfully tried to contact Webb.  The government asserted that the body camera footage would "show the truthfulness and veracity" of Webb's statements, specifically considering that she incriminated herself by admitting to the officer that she pulled out a gun from her purse and pointed it at Hubbard.

Ultimately, the district court admitted the police reports and body-camera videos.

## I.    The District Court's Findings

The district court found that, as to the Webb incident, the government met its burden to show that (1) Hubbard committed felony family violence battery against Webb, a Grade A violation; and (2) Hubbard possessed a firearm as a convicted felon, a Grade B violation.

Under Georgia law, a person commits family violence battery when he commits battery against the mother of his child. O.C.G.A. § 16-5-23.1(f).  The first conviction of family violence

---

to children, for having caused visible bodily harm to Webb and taking her money by force in front of their child; and (3) in 2018 for, in relevant part, a 2016 felony family violence battery, criminal trespass, and third-degree cruelty to children for having intentionally caused visible bodily harm to Webb in front of their child and damaging her property.

As to Douglas, Hubbard was convicted in 2018 for a 2017 felony aggravated assault against Douglas, felony family violence battery, possessing a firearm during the commission of a felony, and being a felon in possession of a firearm for shooting a gun at Douglas.

battery is a misdemeanor, but any subsequent conviction of that offense is a felony. *Id.* § 16-5-23.1(f)(2).[2] Undisputedly, Hubbard had prior convictions for family violence battery. *See supra* n.1.

As to the firearm, the district court explained that Webb never wavered when "[s]he said it the first time; she said it the second time; she explained where he got it; she explained why he got it; she explained what he did with it."

Turning to the Douglas incident, the district court found that Hubbard's inability to cross-examine Douglas "weigh[ed] differently." Although the court believed Hubbard had an altercation with Douglas that evening that caused her to call the police, she "was not truthful with the police on that night about what happened, that there was an altercation . . . ." The district court found that the government (1) did not meet its burden as to the burglary or the theft by taking allegations, but (2) did meet its burden as to Hubbard's misdemeanor obstruction of a law enforcement officer, a Grade C violation, when Hubbard tried to flee on foot.

---

[2] To prove family violence battery under Georgia law, the government must demonstrate that the defendant "intentionally cause[d] substantial physical harm or visible bodily harm to [the victim]." O.C.G.A. § 16-5-23.1(a). The term "visible bodily harm" means "bodily harm capable of being perceived by a person other than the victim." *Id.* § 16-5-23.1(b). Visible facial redness after having been punched in the face constitutes "visible bodily harm" for the purpose of § 16-5-23.1(b). *Gilbert v. State*, 629 S.E.2d 587, 588 (Ga. Ct. App. 2006). Hubbard did not challenge the application of *Gilbert* to his case.

Ordinarily, based on Hubbard's Grade A violation and a criminal history score of VI, his advisory guidelines range would be 33 to 41 months of imprisonment. *See* U.S.S.G. § 7B1.4(a). However, because Hubbard's underlying stolen-firearms conviction was only a Class C felony, his statutory maximum revoked sentence was 24 months. *See* 18 U.S.C. §§ 924(a)(2), 3559(a)(3), 3583(e)(3). As such, the district court determined Hubbard's advisory guidelines range was 24 months of imprisonment. *See* U.S.S.G. § 7B1.4(b)(1); 18 U.S.C. § 3583(e)(3).

The district court revoked Hubbard's supervised release and sentenced him to 24 months of imprisonment followed by 12 months of supervised release. Hubbard reiterated his prior objections and objected to the substantive reasonableness of the sentence. Hubbard timely appealed.

## III. DISCUSSION

As an initial matter, Hubbard admitted to the allegations set forth in Violation Three (multiple failures to report to his probation office), a Grade C violation. Hubbard's admitted Violation Three is sufficient to justify revocation of his supervised release. *See United States v. Vandergrift*, 754 F.3d 1303, 1307 (11th Cir. 2014). The issue here is not whether the district court erred in the first place by revoking supervised release.

In addition, Hubbard does not dispute that Webb's and Gaescudero-Suarez's video-recorded statements, if properly admitted, were sufficient to establish by the preponderance of the evidence that he committed felony family violence battery of

Webb, a Grade A violation.[3]  At bottom, the question becomes whether the district court abused its discretion or violated Hubbard's due process rights (1) by admitting Webb's and Gaescudero-Suarez's video-recorded statements and (2) based thereon, finding that Hubbard committed felony family violence battery of Webb. [4]

## A.    Recorded Hearsay Statements in Body-Camera Videos

The Federal Rules of Evidence do not apply in revocation proceedings, but certain minimal due process requirements apply to the revocation of supervised release, including those incorporated into Fed. R. Crim. P. 32.1.  *Frazier*, 26 F.3d at 114.

Rule 32.1 provides that a judge must give a defendant "an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear."  Fed. R. Crim. P. 32.1(b)(2)(C). An exception to the right to confrontation and cross-examination applies where the court finds "good cause" for not allowing the confrontation.  *See Frazier*, 26 F.3d at 114; *United States v. Penn*, 721

---

[3] While Hubbard objects to admission of the police reports, he focuses his appeal on the recorded statements in body-camera videos; so we do too.

[4] We review a district court's revocation of supervised release, as well as the reasonableness of a revocation sentence, for abuse of discretion.  *United States v. Frazier,* 26 F.3d 110, 112 (11th Cir. 1994) (revocation); *United States v. Trailer*, 827 F.3d 933, 935-36 (11th Cir. 2016) (sentence upon revocation).  We ordinarily review constitutional challenges to a sentence *de novo*.  *United States v. Bowers*, 811 F.3d 412, 430 (11th Cir. 2016).

F.2d 762, 764 (11th Cir. 1983).  Good cause for admitting hearsay can exist in cases where it would be difficult or expensive to procure live witnesses.  *Penn*, 721 F.2d at 765.

To that end, when deciding whether to admit hearsay testimony[5] in a supervised release revocation hearing, a district court "must balance the defendant's right to confront adverse witnesses against the grounds asserted by the government for denying confrontation."  *Frazier*, 26 F.3d at 114.  It is error to "not engage in this balancing test," and a violation of a defendant's due process rights.  *Id.*

Additionally, the hearsay statement that the government seeks to use against the defendant "must be reliable."  *Id.*  A declarant's statements are more likely to be reliable if the statements were made close in time to the event in question; were made spontaneously or against the declarant's own penal interests; or are corroborated by other evidence in the record.  *United States v. Reme*, 738 F.2d 1156, 1168 (11th Cir. 1984); *see also United States v. Baptiste*, 935 F.3d 1304, 1317 (11th Cir. 2019).

## B.    Webb's Recorded Statements

Because the parties so agree, we assume *arguendo* that the district court was required to perform a *Frazier* balancing test as to a victim's statements in a police body-camera video on the scene.

---

[5] Under the Federal Rules of Evidence, "hearsay" is an out-of-court statement offered "to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).

We readily conclude that the district court did not abuse its discretion or err (1) in its *Frazier* balancing or (2) in finding Webb's video-recorded statements reliable. *See Frazier*, 26 F.3d at 114.

The district court explicitly balanced Hubbard's right to confront Webb against the government's grounds for not calling her as a witness. Namely, in addition to Webb's refusing involvement, the government cited its reluctance to force Webb to endure additional trauma by testifying, considering that Hubbard had abused her for over a decade and had committed crimes against her similar to that alleged in the amended petition. The record before the district court amply demonstrated that Webb's refusal to testify, as well as her history of surviving Hubbard's domestic abuse, hindered the government's ability to procure her as a live witness, and thus constituted good cause for admitting her statements without confrontation. *See Frazier*, 26 F.3d at 114; *Penn*, 721 F.2d at 764.

As regards Webb's reliability, the district court (1) questioned Probation Officer Robinson about her attempts to contact Webb; (2) considered the reasons that a domestic violence victim might not want to testify; and (3) discussed Webb's behavior and choices in her video-recorded statement before finding Webb's statements reliable.

The district court also did not abuse its discretion by finding Webb's recorded statements reliable. It explained that in the video, Webb (1) gave internally consistent statements when questioned by Gaescudero-Suarez, (2) acknowledged potentially incriminating

aspects of the encounter, and (3) was unwilling to exaggerate Hubbard's use of the firearm, all of which are indicators of reliability. *See Reme*, 738 F.2d at 1168; *Frazier*, 26 F.3d at 114; *see also United States v. Chapman*, 866 F.2d 1326, 1331 (11th Cir. 1989).

The district court also acknowledged that Hubbard's criminal history corroborated Webb's recorded statements, as Hubbard was thrice convicted of similar crimes against Webb. *See Reme*, 738 F.2d at 1168; *Baptiste*, 935 F.3d at 1317. Webb made the video-recorded statements within an hour of the encounter with Hubbard, further supporting their reliability. *See Reme*, 738 F.2d at 1168.

The district court did not abuse its discretion or violate Hubbard's due process rights by admitting Webb's video-recorded statements to Officer Gaescudero-Suarez.

## C.    Gaescudero-Suarez's Recorded Statements

As to Gaescudero-Suarez's video-recorded statements, the parties agree that the district court (1) did not conduct a *Frazier* balancing analysis before admitting them, and (2) relied in part on Gaescudero-Suarez's statements to find that Hubbard committed a felony family violence battery, a Grade A violation.

Nonetheless, we agree with the government that any *Frazier* error was harmless because Gaescudero-Suarez's video-recorded statements were likely admissible under Federal Rule of Evidence 803(1) as present sense impressions. Rule 803(1) provides that, regardless of whether the declarant is available as a witness, a statement "describing or explaining an event or condition, made

while or immediately after the declarant perceived it" is admissible as a "present sense impression" hearsay exception. Fed. R. Evid. 803(1). The theory underlying this hearsay exception is that the "substantial contemporaneity of the event and the statement negate the likelihood of deliberate or conscious misrepresentation." *United States v. Scrima*, 819 F.2d 996, 1000 (11th Cir. 1987) (quotation marks omitted).

Gaescudero-Suarez described Webb's injuries that he did and did not observe on her face within minutes of examining it, likely meeting the requirements for the present sense impression hearsay exception. *See* Fed. R. Evid. 803(1). As a present sense impression, Gaescudero-Suarez's description of Webb's injuries would constitute a sufficiently reliable and accurate representation of his perceptions, such that it would be admissible, regardless of the officer's availability. Fed. R. Evid. 803(1); *see Scrima*, 819 F.2d at 1000; *Reme*, 738 F.2d at 1168.

We recognize that Gaescudero-Suarez told his supervising officer that Webb did not "really have any markings left" from being punched in the face. Yet, Gaescudero-Suarez clarified what he meant when he explained to a domestic violence detective that Webb did "have a little bit of redness" on the side of her face and her ear but had no lacerations. It is reasonable for Gaescudero-Suarez to provide a more nuanced description of Webb's injuries to the domestic violence detective than his supervising officer, considering the circumstances of her injuries. While Webb's redness was not visible on Gaescudero-Suarez's

body-camera video, the video also does not contradict his description of her injuries, as the bright lighting rendered Webb's facial details indecipherable.  Indeed, the district court specifically noted such.  Lastly, Gaescudero-Suarez twice reported Webb's injuries in his police report, describing her injuries, in part, as "[r]edness" after having been "[p]unched on the face."

Thus, any alleged error in admitting Gaescudero-Suarez's recorded statements without a *Frazier* balancing was harmless because his statements would likely be admissible as a present sense impression under Rule 803(1).  *See* Fed. R. Evid. 803(1). Alternatively, even if Gaescudero-Suarez's recorded statements were not admissible as a present sense impression, (1) his statements were reliable and not contradicted by his body-camera video; and (2) Hubbard does not contend, much less demonstrate, that Gaescudero-Suarez's statements are materially false.  *United States v. Taylor*, 931 F.2d 842, 847 (11th Cir. 1991) (explaining that, at a supervised release revocation hearing, "the defendant must show . . . that the challenged evidence is materially false or unreliable" to establish a due process violation (quotation marks omitted) (quoting *Reme*, 738 F.2d at 1167-68)).

## D.    Hubbard's Remaining Contentions

Hubbard also argues that his due process rights were violated because (1) he was not given sufficient notice that the government would seek to revoke his supervision for being a felon in possession of a firearm during the Webb incident; and (2) the district court did not conduct a *Frazier* analysis regarding Officer

Taylor's body camera footage from the Douglas incident when finding that Hubbard obstructed a law enforcement officer.

We need not address these arguments because (1) Hubbard's felony family violence battery as to Webb is a Grade A violation of supervised release, *see* U.S.S.G. § 7B1.1(a)(1), and (2) that Grade A violation controlled Hubbard's violation grade when the district court calculated his advisory guidelines and then his statutory maximum sentence, *see id.* § 7B1.1(b).

## IV. CONCLUSION

Finding no reversible error, we affirm the 2024 revocation of Hubbard's supervised release and the resulting sentence.

**AFFIRMED.**