UNITED STATES of America,
Plaintiff-Appellant,

v.

Belony SAINTIL and Kersazan Tacius,
Defendants-Appellees.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Kersazan TACIUS and Belony Saintil,
Defendants-Appellants.

Nos. 83–5811, 83–5828.

United States Court of Appeals,
Eleventh Circuit.

Feb. 22, 1985.

James G. McAdams, III, Michael Burnbaum, Asst. U.S. Attys., Miami, Fla., for U.S. in No. 83–5811.

Hugh Behan, Miguel Caridad, Asst. Federal Public Defenders, Thomas Almon, Miami, Fla., for Kersazan Tacius in No. 83–5811.

Hugh J. Behan, Miguel Caridad, Asst. Federal Public Defenders, Miami, Fla., for Kersazan Tacius in No. 83–5828.

Thomas Almon, Miami, Fla., for Belony Saintil in No. 83–5828.

Stanley Marcus, U.S. Atty., Michael Burnbam, James G. McAdams, Linda Collins-Hertz, Asst. U.S. Attys., Miami, Fla., for U.S. in No. 83–5828.

Before HILL, KRAVITCH and SMITH *, Circuit Judges.

JAMES C. HILL, Circuit Judge:

Appellants Kersazan Tacius and Belony Saintil were convicted of one count of conspiracy and five counts of attempted smuggling of illegal aliens into the United States, in violation of 8 U.S.C. § 1324(a)(1).[1] Appellants raise three issues on appeal: (1) whether the district court erred in denying appellants' motion to dismiss the charges based upon the unavailability of certain witnesses; (2) whether the district court erred in admitting into evidence testimony that the appellants murdered, battered, starved, and otherwise mistreated passengers on the boat which they were captaining; and (3) whether the district judge erred in considering certain evidence at the appellants' sentencing hearing. The government raises one issue on cross-appeal, contending that the district judge improperly dismissed four counts of a superseding indictment on the basis of prosecutorial vindictiveness. We affirm the convictions, and choose not to decide the issue raised by the government.

FACTS

On July 25, 1981, the United States Coast Guard discovered a 33 foot wooden sailing vessel, the JESULA, aground in the vicinity of Key West, Florida. Aboard the ves-

---

* Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. Section 1324 provides, in relevant part;
Any person, including the owner, operator, pilot, master, commander officer, agent, or consignee of any means of transportation who—
(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;
. . . .
any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony.

sel were approximately 165 undocumented Haitian nationals, including appellants. At trial, nine of these passengers testified for the government to the following events.

The JESULA had left Haiti about two weeks earlier, carrying approximately 215 Haitians who were to be illegally transported to the United States. Prior to their departure, many of these Haitians paid for their passage to a man known as Fito, the apparent owner of the vessel. One passenger testified that he paid his money directly to the appellants. Prior to the JESULA's departure, Fito turned the vessel over to the appellants, and told them to call him after their arrival in the United States. Once at sea, the appellants announced to the passengers that they were the captains of the vessel.

The voyage soon became terrifying to the passengers, who were subject to horrifying abuses at the hands of the appellants. The government witnesses testified that appellants controlled the food and water on board the ship, and refused to distribute it to many passengers who could not pay for it. Beatings were administered to some of those who asked for food and refreshment to quench their hunger and thirst. Appellants approached some of the women passengers, demanding sexual favors and threatening that the women might be denied food or thrown overboard if they refused. Anyone who disobeyed or disagreed with commands given by the appellants was beaten or threatened with such harm. Beatings were administered with fists, a board, a rock, and a machete; and some directly resulted in the deaths of passengers. Another passenger, Andre La-Pointe, was murdered and thrown overboard by the appellants for threatening to tell American authorities about the atrocities committed during the voyage.[2] The remaining passengers were warned about mentioning anything that happened aboard the ship to Immigration authorities; and Saintil told the passengers that his brother

was an Immigration agent, and that they both would seek out and harm anyone who "talked."

When the vessel finally landed in the United States, authorities from the Immigration and Naturalization Service (INS) took custody of the aliens. INS agent Anglade, who was in charge at the scene, testified that she overheard Saintil instruct the other passengers not to discuss the voyage with anyone, and that if they did, "their tongues will get as big as a cow's tongue." She also observed that the appellants appeared to be more healthy than the other passengers.

The appellants were originally charged in a six-count indictment. Subsequently, the district court granted the appellants' motion to dismiss the indictment based on a violation of the Speedy Trial Act. The government appealed, and the Eleventh Circuit reversed and reinstated the original indictment. *United States v. Saintil*, 705 F.2d 415 (11th Cir.), *cert. denied*, — U.S. ——, 104 S.Ct. 171, 78 L.Ed.2d 155 (1983). The government then filed a ten-count superseding indictment containing one charge of conspiracy and nine counts of attempted smuggling of aliens. The defendants filed a motion to dismiss four of the counts on the ground of prosecutorial vindictiveness. The district court granted the motion, but allowed all counts to go to the jury. The jury convicted both appellants on all counts. Each appellant was subsequently sentenced to thirty years imprisonment. This appeal followed.

## DISCUSSION

### A. *Missing Witnesses.*

Shortly after arraignment, at the request of defense counsel, the government was ordered to provide the names and whereabouts of each of the passengers who had been aboard the JESULA. The majority of the passengers were in detention centers in

---

2. When the passengers first sighted land as the boat approached the United States, LaPointe stated that he was glad to see Miami, and that he was going to explain to U.S. Immigration authorities the atrocities which the appellants had committed. The appellants then beat La-Pointe, strangled him with a rope, and threw his body overboard.

the United States or Puerto Rico, but approximately 15 of them had returned to Haiti. At trial, both appellants testified that they were not in charge of the ship; that two other individuals, Lineus Joseph and Virsius Silius, were in control. Joseph was one of the persons who had returned to Haiti, and Silius could not be located in INS records. Appellants claim that the testimony of these two unavailable witnesses was essential to their defense, and that the government, having deported these witnesses, violated their fifth amendment right to due process and their sixth amendment right to compulsory process.

To prove a violation of a defendant's constitutional rights resulting from the government's deportation of a witness, a defendant "must show some reasonable basis to believe that the deported witness would testify to material and favorable facts." *United States v. Schaefer,* 709 F.2d 1383, 1386 (11th Cir.1983); *see United States v. Valenzuela-Bernal,* 458 U.S. 858, 867–72, 102 S.Ct. 3440, 3446–49, 73 L.Ed.2d 1193 (1982). The appellants have not satisfied this burden. First, the record does not show that the government actually deported or sent away the witnesses claimed to be material.[3] Second, there has not been the slightest indication that the testimony of Joseph and Silius would be either material or favorable to the appellants. Testimony indicated that Joseph and Silius had steered the vessel, but only pursuant to appellants' orders. It is true that the appellants sought to charge the missing witnesses with the commission of the crime, but there is nothing to indicate that these witnesses would, as if in a "Perry Mason"

rerun, confess on the witness stand that they were, indeed, the criminals. It is highly likely that the testimony of these witnesses would merely be repetitive with the other testimony in the case indicating that the appellants were in control of the vessel. We find no error in the district court's refusal to dismiss the charges against appellants due to the unavailability of these witnesses.

**B.** *Admission of Testimony as to Atrocities Committed on the Ship.*

The nine Haitian passengers called by the government were permitted to testify, to a limited degree, that the appellants murdered, battered, starved, and otherwise mistreated the vessel's passengers. Appellants claim that this evidence was irrelevant to the charge of alien smuggling, unnecessary to the government's proof of its case, and prejudiced them beyond any cure of a limiting instruction, thus denying them a fair trial. They claim that this evidence should have been excluded under Rule 403 or Rule 404(b) of the Federal Rules of Evidence.[4]

Rule 404(b) applies only to evidence of crimes and acts extrinsic to the charged offense. "Evidence of criminal activity other than the charged offense is not considered extrinsic within the proscription of Rule 404(b) ... if it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense." *United States v. Weeks,* 716 F.2d 830, 832 (11th Cir.1983); *United States v. Kloock,* 652 F.2d 492, 494 (5th Cir. Unit B 1981). In the present case, the atrocities committed by the appellants

---

**3.** At oral argument, the government stated that the Haitians had been given the option of becoming repatriated with Haiti, and were thus permitted to return to Haiti voluntarily in order to avoid detention in the United States. From all the record shows, this is what happened with respect to the witnesses the appellants claim they wanted to interview and produce.

**4.** Rule 403, Fed.R.Evid., states that:
> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the

jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence:

Rule 404(b) states that:
> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

occurred during and arose out of the attempted smuggling of the Haitians into the United States, which was the charged offense. Therefore, the evidence of these acts is not extrinsic to the charged offense, and Rule 404(b) is not applicable.

However, we must still balance the probative value of the evidence against the danger of unfair prejudice pursuant to Rule 403. On this point, the present case is largely governed by *United States v. Reme*, 738 F.2d 1156 (11th Cir.1984), a very similar Haitian smuggling case. In *Reme*, a similar wooden sailboat left Haiti for the United States with approximately 89 Haitian nationals on board. In describing the defendant captains' control over the boat, the government's Haitain witnesses were permitted to testify as to how the defendants "made the passengers sing voodoo songs ... and submit to searches for valuables and black magic, ordered and controlled the distribution of food, and water, on the boat, and ... beat the passengers." *Id.* at 1159 (cites to record omitted). The witnesses also described a voodoo ceremony conducted by the defendants that led to the disappearance and apparent death of two of the passengers.[5] *Id.* at 1160. This court held that:

> The trial court did not abuse its discretion in admitting evidence of the voodoo ceremony and the disappearances of Vixamar and Alliance. *See U.S. v. Russell*, 703 F.2d 1243, 1249 (11th Cir.1983). To prove the offenses charged the prosecution had to show that Pierrot [the alleged captain] was more than simply a passenger who steered the boat from time to time. The government had to convince the jury that he was in control of the transporting scheme, a smuggler rather than a passenger. In addition, this evidence had to be sufficient to prove the elements of conspiracy, including the

agreement to commit the substantive offense.

When the voodoo evidence was offered, the defense took the position that it was merely cumulative proof of control that was unnecessary to the government's case; at the same time, however, the defense was unwilling to stipulate that the government had proven control. The evidence concerning the searches for black magic and the treatment of the two missing men was strongly probative on the question of whether all of the defendants were in control of the vessel, or whether they were simply passengers.

....

> The "passenger defense" was rendered less credible by the evidence of the defendants' participation in disciplining passengers and searching them for black magic and valuables.

> Against this probative value we weigh the prejudicial effect of the evidence. Throughout the trial the judge repeatedly cautioned the jury concerning the limited purpose for which the evidence was admitted. The jury charge contained three and a half pages of instructions reminding the jury of the limited basis of admissibility of the evidence, including an instruction that the case had nothing to do with voodoo or religion or the religious beliefs of the defendants or their passengers. Under these circumstances, we cannot say that it was an abuse of discretion to admit the evidence.

*Id.* at 1164–65.

As in the *Reme* case, to prove the offenses charged in the present case the government had to convince the jury that the appellants were in control of the transporting scheme; that they were smugglers rather than mere passengers. Since the appellants heatedly denied that they were

---

5. Prior to the voodoo rituals, the boat's progress had been hindered by lack of wind, which the defendants attributed to the presence of someone on the boat with "black magic." Two male passengers found to possess "black magic" were undressed and bathed in special water, then made to sit cross-legged facing each other while begging for their lives. The other passengers were sent below for the night, while the ritual continued. The two passengers were never seen again. 738 F.2d at 1160.

the captains of the ship, evidence of the atrocities imposed on the passengers by appellants was highly probative on the issue of control.[6]

■ This probative value must be weighed against the prejudicial effect of the evidence.[7] We note that each of the prosecution's nine Haitian witnesses testified to beatings and murders administered by the appellants to the passengers; heinous acts that would in themselves have a highly inflammatory effect on the jury. However, the witnesses generally described merely the fact that beatings and deaths occurred; they did not describe the details of specific incidents.[8] Furthermore, the judge cautioned the jury as to the limited purpose for which the evidence was admitted.[9] While it is sometimes difficult to draw lines as to the admissibility of evidence under Rule 403, we cannot say that it was an abuse of discretion, under the totality of circumstances presented here, to admit this evidence for the purpose of proving control over the vessel. *See United States v. Reme*, 738 at 1164–65; *United States v. Benton*, 637 F.2d 1052, 1057–58 (5th Cir. Unit B 1981) (prejudicial effect of evidence of other crimes or acts decreased by cautionary instructions to jury and elimination of unnecessary details).

6. Evidence of the murder of LaPointe, committed after he threatened to disclose to U.S. Immigration authorities the atrocities committed by the appellants during the smuggling operation, is also admissible as an act committed after the crime to suppress a potential witness and to avoid detection for the crime of smuggling aliens. *See e.g.,* 1 Wharton's Criminal Evidence, § 216 (13th ed. 1972) (any effort by the accused directly or indirectly to suppress or destroy evidence, including the murder of a witness, is relevant as a circumstance tending to show guilt).

7. "Prejudice" relates to the likelihood of inciting the jury to an irrational decision based on an improper basis, such as the character and past conduct of the accused, rather than on evidence presented on the crime charged. *United States v. Benton*, 637 F.2d 1052, 1057 (5th Cir. Unit B 1981); *see* Fed.R.Evid. 403 advisory committee note; *United States v. Astling*, 733 F.2d 1446, 1457 (11th Cir.1984).

8. Typical of this testimony, although more detailed than most, is the following colloquy between the prosecutor and Estinfort, one of the Haitian witnesses:

Q. Did you observe Belony and Kersazan do anything after they ordered passengers [sic] the first day of the trip?
A. They beat passengers who were asking for water. They beat them.
Q. During the course of the trip, were there other crew men on the boat?
A. No.
Q. Again, the second day of the trip, one day after you left Anse a Chatte, did you ever hear Belony make any additional announcements regarding money?
A. He told the passengers that if they got money, to give him money or he is going to beat them up if they don't give him money.
Q. Did you ask or did anyone ask for water from the captains, Belony and Kersazan?
A. Yes. When they asked for water, they did not want to give them the water.
Q. What happened when they asked for water? What did you observe?
A. When the passengers asked for water, they did not want to give them water. They beat them up and some people started to get sick.
Q. Did you see Belony or Kersazan with any objects in their hand or any weapons?
A. Yes, they had a knife and a rope and when the people were asking for water, sometimes they beat them up with that.

9. In the midst of the examination of the government's fifth witness, the judge instructed the jury as follows:

Some of the witnesses that you heard last week and today have testified and others may yet testify regarding the incidents which allegedly occurred on the JESULA, that is the boat, which testimony, if believed by you, may constitute misconduct other than for which the defendants are now on trial.

The jury is instructed that such evidence may not be considered by you in determining the defendants' ultimate guilt or innocence of the crimes charged in the indictment, the smuggling offenses that are alleged in the indictment.

Rather if the jury believes such evidence of other alleged misconduct, the jury may, but is not obliged to consider that evidence in determining whether or not the defendant willfully maintained control of the vessel JESULA during its voyage.

The evidence is not offered to show that the individual defendants are bad people or any conduct or crimes or offenses other than the crimes or offenses which are charged in this indictment and goes only to the question of control of the vehicle.

### C.  *Sentencing.*

At appellants' sentencing hearing, two of the Haitian trial witnesses testified to additional brutal beatings and murders that had allegedly occurred during the voyage. In addition, INS agent Anglade testified concerning statements made to her by several passengers as to numerous other murders committed by appellants during the voyage. Anglade also testified that, upon examining the vessel, she had found machetes, ropes, and dried blood around the mast. Appellants did not attempt to rebut any of the testimony presented. The district judge stated that he believed the testimony, and sentenced each of the appellants to thirty years imprisonment—the maximum sentence allowable for their crimes. Appellants allege that the court's reliance on the above testimony in sentencing deprived them of due process of law. We disagree.

■ A district judge has very broad discretion in the imposition of criminal sentences. The severity of a sentence imposed within statutory limits is insulated from appellate review, although the judicial process by which a sentence is determined is subject to review. *United States v. Reme,* 738 F.2d at 1167. A district judge may consider almost any type of out-of-court information in fixing a sentence, and a defendant is not denied due process of law as long as the information considered is reliable and the defendant is afforded an opportunity to refute it. *Id.* Hearsay testimony may be taken into account as long as it bears minimal indicia of reliability. *Id.*

■ The district judge was well within his bounds in considering the above evidence and imposing thirty year sentences on the appellants. There has been no allegation that the sentencing testimony he relied on was erroneous. The hearsay statements testified to by agent Anglade were reliable—the statements were made to her contemporaneously with the landing of the JESULA, and several passengers made essentially the same statements.

The district judge did not abuse his discretion.

### D.  *Dismissal of Counts for Prosecutorial Vindictiveness.*

■ The superseding indictment filed by the government approximately one month before trial contained ten counts—four more than the original indictment had contained. The district judge dismissed the four additional counts, finding that there was no logical reason for adding these counts except to increase the penalty imposed on the defendants at sentencing. The judge apparently believed that the government was attempting to punish the appellants for their earlier attempts to dismiss the original indictment for Speedy Trial Act violations.

The government contends that this dismissal of the counts was improper, arguing that it had to obtain a new indictment because it could not locate certain witnesses necessary for a prosecution of the counts in the original indictment. However, the government conceded at oral argument that, even if it obtains its desired relief of a reinstatement of the jury verdict on the dismissed charges, it will not seek to impose additional consecutive sentences against the appellants. We decline to determine the issue thus presented. *De minimus non curat lex.*

For the foregoing reasons, the judgment of the district court is

AFFIRMED.