**UNITED STATES of America,**

v.

**Bettina Louise HUDSON.**

**No. 6:03–CR–16–Orl–31JGG.**

United States District Court,
M.D. Florida,
Orlando Division.

April 8, 2003.

Donald A. Lykkebak, Law Office of Donald A. Lykkebak, Orlando, FL, for Defendant.

Philip J. Bonamo, U.S. Attorney's Office, Orlando, FL, for Plaintiff.

### ORDER

PRESNELL, District Judge.

This cause came before the Court for consideration on Defendant Bettina Louise Hudson's Motion to Dismiss the Indict-

ment (Doc. 19), the Government's Response (Doc. 21), Hudson's Reply (Doc. 23), and Hudson's Motion to Compel All Documents Generated by the Border Patrol (Doc. 22).[1] The Court held an evidentiary hearing on the motions on April 2, 2003. The Court has carefully considered the motions, responses, and reply including their attachments, the argument of counsel, the applicable law, the evidence presented at the hearing, and is otherwise fully advised in the premises.

## I.  INTRODUCTION

On January 29, 2003, Bettina Hudson, a U.S. Citizen, was indicted by the grand jury for assaulting, interfering, and resisting a federal law enforcement officer, Senior Border Patrol Agent Alan Kuperstein, during the performance of his official duties, in violation of 18 U.S.C. § 111. The incident giving rise to the charges occurred on January 7, 2003. On January 24, 2003, the two alleged alien witnesses, Ramon Cruz–Marquez and Marcelino Guatemala–Ramirez, were processed for deportation and were removed from the country on January 30, 2003. Hudson made her first appearance on February 12, 2003. On March 21, 2003, Hudson's counsel inquired about interviewing the two witnesses and was told by the Assistant U.S. Attorney assigned to the case that she did not know where the witnesses were. On March 24, 2003, the Assistant U.S. Attorney informed Hudson's attorney that the two witnesses had been deported. Hudson filed the instant motion to dismiss.

In her verified motion to dismiss, Hudson claims that the Government's deportation of two witnesses to the alleged assault

---

1. Part of the requested forms had previously been given to Hudson's counsel. The other portion of the Border Patrol file ("A-file") was submitted to the Court during the hearing for *in camera* review. After reviewing the mate-

rials, the Court concluded that Hudson was entitled to the A-files for the reasons stated in open court, as well as the fact that the information was relevant, exculpatory, and could be used to impeach the Agent's testimony.

violates her Fifth and Sixth Amendment rights because these witnesses would testify that Agent Kuperstein, not Hudson, was the aggressor. The Government responded that Hudson's motion was untimely [2] and nothing more than conjecture, as no one could be sure what either of the two witnesses would say or if in fact they saw anything. The Government further argued that the testimony would not be material. In response, Hudson produced the sworn affidavit of one of the witnesses, Cruz–Marquez.[3] Cruz–Marquez indicated that he saw the entire altercation and that Agent Kuperstein was indeed the aggressor. At the hearing, the Government first argued that Cruz–Marquez's affidavit should bear little weight because it was not subject to cross-examination. Then, the Government argued that his testimony was not permissible because it was cumulative.

## II. BACKGROUND FACTS

During the hearing, the Government introduced the testimony of three Border Patrol Agents, Agents Kuperstein, Cole, and Perez. However, Agent Kuperstein was the only witness to the altercation. The Government and Hudson also introduced numerous exhibits, including the arrest forms for Cruz–Marquez and Guatemala–Ramirez, Agent Kuperstein's incident report, sworn statements from the two witnesses, and an affidavit from Cruz–Marquez.

On January 7, 2003, at approximately 9:30 a.m., Agent Kuperstein was driving around Victoria Plaza shopping center located at 1100 West Orange Blossom Trail in Apopka, Florida in a marked Border Patrol vehicle. Agents Cole and Perez were also driving around Victoria Plaza in an unmarked sport utility vehicle. According to the Agents' testimony and Agent Kuperstein's I–44 Incident Report (Gov't.Resp.(Doc.21) at Ex. B), as Agent Kuperstein's vehicle was spotted by five Hispanic males working on the Sure Cuts landscaping crew, the five men threw down their equipment and ran. The Agents immediately began pursuing the five men. Agent Kuperstein apprehended one man on his own and assisted Agent Cole in apprehending another man.[4] Both men were handcuffed and placed in the back of the Agent Kuperstein's marked patrol car. As Agent Kuperstein drove from the back of the shopping center to the front with his lights flashing, he was met head-on by a red Isuzu Amigo, driven by a blonde female, later identified as Hudson. He had to turn on his siren and motion several times with his hand for Hudson to move her car so that he could get by.[5]

**2.** Even if Hudson's motion was made on February 12, 2003, the date of Hudson's first appearance, it would not change the fact that the two witnesses has been deported on January 30, 2003. Thus, the Government's timeliness argument is without merit.

**3.** To his credit, Hudson's counsel located Cruz in a small village outside of Guadalajara, Mexico. Cruz appeared before the Consulate General of the United States in Guadalajara to execute his affidavit.

**4.** Agent Kuperstein testified that it was not necessary to place the suspected illegal alien that he apprehended with Agent Cole on the ground for handcuffing. However, according to Agent Cole, his memorandum about the incident, and the affidavit of Cruz–Marquez, Cruz–Marquez was forced to the ground for handcuffing.

**5.** Agent Kuperstein testified that there was a utility trailer parked in the rear of Victoria Plaza which had narrowed the area so that it was difficult for two vehicles to pass without one yielding to the other. Hudson introduced as a demonstrative exhibit an aerial photograph of Victoria Plaza that showed the trailer located in the alley. (Def.Ex.3). Agent Kuperstein marked the point of his and Hudson's intersection and drew arrows showing their respective paths of travel.

According to Agent Kuperstein's testimony, he then pulled up alongside James Shelton's vehicle. Agent Kuperstein determined that Shelton was the owner of Sure Cuts and that he was employing the five Hispanic men through a payroll service. Agent Kuperstein told Shelton that he could collect his equipment and leave. As Agent Kuperstein was getting back into his vehicle, Hudson approached him in her vehicle at a high rate of speed. She allegedly exited her vehicle and came towards Agent Kuperstein shouting obscenities. Agent Kuperstein attempted to back Hudson towards the rear of his vehicle when she allegedly lunged at him, grabbing his shoulder. He freed himself and Hudson slapped him, knocking off his sunglasses. Agent Kuperstein pepper-sprayed Hudson and while Agent Kuperstein was trying to restrain Hudson, the two fell to the ground. While on the ground, Shelton approached saying "leave my wife alone." Agent Kuperstein pepper-sprayed Shelton and Shelton backed off. Hudson was handcuffed and Agent Kuperstein called Agents Cole and Perez to assist him.[6] All of this occurred less than ten (10) feet from Cruz–Marquez and Guatemala–Ramirez sitting in the rear of the patrol car.

In contrast, in her verified motion, Hudson claimed that Shelton called her from his cellular phone to bring his payroll records to Victoria Plaza because the Border Patrol agents wanted to see them. She arrived at Victoria Plaza that morning and met Agent Kuperstein in the rear of the shopping plaza. Hudson then drove to the front of the plaza and stopped her vehicle near Shelton. She was outside of her car when Agent Kuperstein drove past, slammed on his brakes, and jumped out of his vehicle. Agent Kuperstein was yelling and cursing at Hudson, saying "You want

to go to f* * * * * * jail? I'll take you to f* * * * * * jail." He rushed Hudson, put his hands on her, sprayed pepper spray in her face striking her with the canister, and threw her to the ground. When Shelton approached, Hudson pepper-sprayed him as well.

Likewise, Cruz–Marquez's affidavit (Def. Ex. 1; Def. Notice of Reply at attach.) indicates that Agent Kuperstein drove from the back of the shopping plaza to the front and briefly spoke with Shelton. Hudson was standing outside of her vehicle. As Agent Kuperstein was pulling away, he drove slightly past Hudson and then abruptly stopped his car and jumped out. Agent Kuperstein was yelling loudly and angrily at Hudson. He grabbed Hudson, held her arms in the air, sprayed pepper spray in her face, and threw her around and then to the ground. When Shelton approached, Agent Kuperstein sprayed him. Cruz–Marquez stated that he saw everything very clearly through the window of the patrol car.

All three officers testified that Cruz–Marqez, Guatemala–Ramirez, and Hudson were taken to the Border Patrol Office on Fairbanks Avenue in Winter Park where they were processed. (*See* Gov't Exs. 1 & 2). According to the two I–213 Records of Deportable/Inadmissible Alien, both Cruz–Marqez and Guatemala–Ramirez "[were] being held as a material witness in a pending case of assault on a federal officer 8 U.S.C. § 111(sic). Subject[s were] arrested at the site where the assault occurred." (*Id.;* Def. Ex. 2). Additionally, Agent Kuperstein's I–44 Incident Report stated: "Final Disposition: Hudson is being charged with 18 U.S.C. § 111, assault on a federal officer, pending a grand jury indictment, as per assistant U.S. Attorney

---

**6.** During this incident with Hudson, Agents Cole and Perez were in the rear of the shopping plaza, and did not witness the altercation. The evidence does not reveal whether Shelton witnessed the incident.

Cynthia Collazo of the Middle District of Florida. Grand jury is tentatively scheduled for 1/16/03 as per AUSA Collazo." (Gov't Resp. at Ex. B, p. 3).

On January 8, 2003, Agent Perez took sworn statements from Cruz–Marqez and Guatemala–Ramirez with Agent Cole present during the interview. Despite the A-files indicating that Cruz–Marquez and Guatemala–Ramirez were being held as material witnesses for the incident between Kuperstein and Hudson, neither Agent Perez nor Agent Cole asked Cruz–Marqez and Guatemala–Ramirez during the sworn interview whether they had witnessed the incident between Hudson and Agent Kuperstein. (Gov't Resp. at Ex. A; Def. Exs. 4, 5). The three Agents testified that Cruz–Marqez and Guatemala–Ramirez were not asked during the interview because earlier each Agent had independently asked Cruz–Marqez and Guatemala–Ramirez whether they had seen anything and both men responded, "No."[7] Further, Cruz–Marqez and Guatemala–Ramirez were not held as stated on the I–213 Records of Deportable/Inadmissible Alien, but were deported on January 30, 2003, one day after Hudson was indicted. The three Agents testified that Cruz–Marqez and Guatemala–Ramirez were not held as material witnesses because the Agents were not sure that Hudson was being charged.

After observing the witnesses and considering their testimony, the Court finds the Agents' testimony that they individually asked Cruz–Marquez and Guatemala–Ramirez whether they saw the incident between Agent Kuperstein and Hudson is undermined by the fact that none of the Agents made mention of this in their reports and the Agents failed to ask the two witnesses during their sworn interviews

despite the I–213 Records of Deportable/Inadmissible Alien stating that both men were being held as material witnesses to a violation of 18 U.S.C. § 111. Furthermore, the Agents' testimony that they were not sure that Hudson would be charged for violating 18 U.S.C. § 111 is undermined by Agent Kuperstein's I–44 Incident Report, which indicates that AUSA Collazo had been contacted and Hudson was being charged for violating 18 U.S.C. § 111 pending a grand jury indictment. Courts sitting as finders of fact are free to accept or reject witness testimony based upon their determination as to the witnesses' credibility. *United States v. Ramirez–Chilel*, 289 F.3d 744, 749, *reh'g en banc denied*, 45 Fed. Appx. 881, (11th Cir.2002), *cert. denied*, —— U.S. ——, 123 S.Ct. 850, 154 L.Ed.2d 789 (2003) (citations omitted).

### III. ANALYSIS

■ The Executive Branch is responsible for the enforcement of criminal laws and the United States' immigration policy. *United States v. Valenzuela–Bernal*, 458 U.S. 858, 863–64, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). In this regard, Congress has determined that prompt deportation constitutes the most effective method for curbing the enormous flow of illegal aliens across our southern border. *Id.* In addition to satisfying immigration policy, the prompt deportation of alien witnesses *who are determined by the Government to possess no material evidence relevant to a criminal trial* is justified by several practical considerations such as prison and jail overcrowding, fiscal expense, and the alien's liberty rights. *Id.* (emphasis added). The Government may, therefore, find itself confronted with the obligation of

---

**7.** There is no written record in any of the Border Patrol files which attest to these "in-

terviews."

prosecuting persons in the position of respondent on criminal charges, and at the same time obligated to deport other persons involved in the event in order to carry out the immigration policies that Congress has enacted. *Id.* Thus, to prove a violation of a defendant's constitutional rights resulting from the Government's deportation of a witness, a defendant "must show some reasonable basis to believe that the deported witness would testify to material and favorable facts." *United States v. Saintil,* 753 F.2d 984, 987 (11th Cir.1985) (quoting *United States v. Schaefer,* 709 F.2d 1383, 1386 (11th Cir.1983); citing *Valenzuela–Bernal,* 458 U.S. at 867–72, 102 S.Ct. 3440).

A defendant's right to call "witnesses in his favor" is found in the Compulsory Process Clause of the Sixth Amendment. *Rock v. Arkansas,* 483 U.S. 44, 52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (citing *Washington v. Texas,* 388 U.S. 14, 17–19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)). Logically included in the accused's right to call witnesses whose testimony is "material and favorable to his defense," *Valenzuela–Bernal,* 458 U.S. at 867, 102 S.Ct. 3440, is a right to testify himself, should he decide it is in his favor to do so. *Id.* Indeed, the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses-it guarantees him "compulsory process for obtaining witnesses in his favor." *Valenzuela–Bernal,* 458 U.S. at 867, 102 S.Ct. 3440 (quoting U.S. Const., amend. 6 (emphasis added)).

In *Valenzuela–Bernal,* the Court imported the materiality requirement from the line of cases beginning with *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), into compulsory process clause analysis. *Taylor v. Singletary,* 122 F.3d 1390, 1394 (11th Cir.1997) (citing *Valenzuela–Bernal,* 458 U.S. at 872–74, 102 S.Ct. 3440; *see also Pennsylvania v. Ritchie,* 480 U.S. 39, 56–58, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)). Following this line of cases, the Supreme Court concluded that evidence is material "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Id.* at 1394–95 (citing *Valenzuela–Bernal,* 458 U.S. at 874, 102 S.Ct. 3440). Because prompt deportation deprives the defendant of an opportunity to interview the witnesses to determine precisely what favorable evidence they possess, a defendant cannot be expected to render a detailed description of their lost testimony. *Valenzuela–Bernal,* 458 U.S. at 873, 102 S.Ct. 3440. But this does not relieve the defendant of the duty to make some showing of materiality. *Id.*

Here, the Government deported Cruz–Marquez and Guatemala–Ramirez despite the fact that the I–213 Records of Deportable/Inadmissible Alien stated that they were being held as material witnesses to a violation of 18 U.S.C. § 111 and AUSA Collazo indicated that the Government was going to charge Hudson for violating that statute.[8] Furthermore, both men had the opportunity to view the entire incident and Cruz–Marquez's affidavit clearly demonstrates that he indeed did see the altercation between Agent Kuperstein and Hudson.[9] Finally, Cruz–Marquez's testimony corroborates Hudson's

---

**8.** The Government asserts that the required incarceration of Cruz–Marquez and Guatemala–Ramirez would be unfair to the witnesses. Although the Government's argument has some merit, the Agents testified that Cruz–Marquez and Guatemala–Ramirez could have been held as material witnesses or released from jail if they did not have a criminal record pending Hudson's trial.

**9.** Why the Government chose to deport these witnesses and failed to inquire about the incident during their sworn statements is curious. The two witnesses who were in a position to see everything were asked nothing.

version of the events, contradicts Agent Kuperstein's claims, and directly calls into question Agent Kuperstein's credibility. Hence, Cruz–Marquez's testimony is both favorable and material. It is exculpatory and it can be used to impeach Agent Kuperstein, who, like Hudson, has a material interest in the case. By deporting these witnesses, the Government has made Cruz–Marquez's favorable testimony unavailable. Accordingly, Hudson has been impermissibly denied her Sixth Amendment right to call favorable witnesses. Furthermore, due process under the Fifth Amendment guarantees a defendant fundamental fairness. *Valenzuela–Bernal,* 458 U.S. at 872, 102 S.Ct. 3440 (citation omitted). The Government's deportation of these witnesses was inherently unfair under the facts and circumstances of this case. Therefore, dismissal of the indictment is appropriate.[10]

### IV. CONCLUSION

Based on the foregoing, it is

**ORDERED AND ADJUDGED** that:

(1) Defendant's Motion to Compel (Doc. 22) is **GRANTED;** and

(2) Defendant's Motion to Dismiss the Indictment (Doc. 19) with prejudice is **GRANTED.**

---

10. The Government's argument that Cruz–Marquez's and Guatemala–Ramirez's testimony would be cumulative is meritless. While the Court is aware of the line of cases where courts have ruled that a deported witness' testimony would be cumulative or repetitive, the instant facts are distinguishable from those cases. An example will illustrate the point. Assume that this case went to trial and Cruz–Marquez and Guatemala–Ramirez were available to testify. The Government would call its only witness to the altercation, Agent Kuperstein, and then it would rest. Hudson could call Shelton, but there is no evidence to suggest that Shelton saw the entire incident or witnessed how the incident began. So, the Defense is left with Hudson who has a constitutional right not to testify. However, under the Government's theory, Hudson would be forced to testify against her right not to do so in order to refute Agent Kuperstein's testimony because Cruz–Marquez's and Guatemala–Ramirez's testimony would be excluded as cumulative. Under these circumstances, it is clear that Cruz–Marquez's testimony cannot be cumulative.