[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-10591
Non-Argument Calendar
_____

D.C. Docket No. 4:07-cr-10049-KMM-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN ANTONIO GUTIERREZ ARENCEBIA,
a.k.a. Juan Antonio Arencebia,

Defendant-Appellant.


_____

No. 14-10593
Non-Argument Calendar
_____

D.C. Docket No.  4:08-cr-10070-KMM-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN GUTERRIEZ,

Defendant-Appellant.

————————————————

No. 14-10594
Non-Argument Calendar
————————————————

D.C. Docket No.  4:08-cr-10068-KMM-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN GUTIERREZ,

Defendant-Appellant.

————————————————

Appeals from the United States District Court
for the Southern District of Florida
————————————————

(June 24, 2015)

Before JORDAN, JULIE CARNES and JILL PRYOR, Circuit Judges.

PER CURIAM:

2

Juan Gutierrez ("Defendant") appeals his 72-month sentence of imprisonment, imposed for violating conditions of his supervised release in three separate cases. Defendant argues that his sentence was procedurally unreasonable because the district court improperly considered alleged criminal conduct by Defendant that had not been proved. Defendant also argues that his sentence was substantively unreasonable because the district court abused its discretion in weighing the factors under 18 U.S.C. §§ 3583(e) and 3553(a).

Upon careful review of the record and the parties' briefs, we conclude that, in imposing sentence, the district court committed procedural error by largely relying on alleged criminal conduct by Defendant that the latter argued had not been proved by a preponderance of the evidence, and that the court did so after having stated that it would not consider this conduct. We therefore **VACATE** Defendant's sentence and **REMAND** for a new sentencing hearing on Defendant's revocation proceeding.

## I.    BACKGROUND

Defendant, a Cuban national who left Cuba in February of 2004 at the age of 36 for Miami, Florida, is a prodigious violator of federal immigration laws. His series of human-smuggling attempts, arrests, deportation orders, and prosecutions form the backdrop of this factually-complex appeal. Within a year after his arrival in the United States, Defendant had already been apprehended for piloting a boat

that was transporting multiple unauthorized aliens.  Two more such interdictions of boats that he was operating occurred within the next two years, leading to the Defendant's conviction and incarceration on three separate alien-smuggling charges.  Also as a result of Defendant's smuggling activity, Immigration and Customs Enforcement ("ICE") issued at least two administrative warrants of removal (on August 3, 2006 and February 20, 2007), but on neither occasion was Defendant actually removed; instead he was released on an order of supervision.

Defendant received a total 42-month sentence on the above three convictions and upon completion of this sentence, he began his terms of supervised release in 2011.  But in October 2013, Defendant was arrested yet again on suspicion of having attempted to smuggle aliens, as well as for technical violations arising from his related travel on the high seas while being under an order of supervision.  Before federal authorities ("the Government") had yet sought an indictment on these charges, the United States Probation Office filed a petition to revoke Defendant's terms of supervised release based on the conduct underlying this October arrest.  It is this revocation hearing and the sentence ultimately imposed by the district court that is the subject of the present appeal.  But before getting to that, it is helpful to first briefly discuss the three underlying convictions for which supervised release had been imposed.

### A.    Three Underlying Convictions

4

1.    Alien Smuggling Conviction Based on June 2005 Interdiction

On June 7, 2005, the United States Coast Guard interdicted a drifting vessel approximately 15 nautical miles off the coast of North Key Largo, Florida. Defendant was one of the two operators of the vessel, which was carrying 20 Cuban nationals as passengers.  The Coast Guard seized the vessel, which was owned by the father of a known alien smuggler, Javier Lopez.  Responding to questions, both Defendant and his fellow pilot, Ernesto Lopez, explained that they had borrowed the boat from Javier Lopez to go fishing and had happened upon the 20 Cuban nationals stranded on some rocks.[1]

Based on this incident, in December 2008, Defendant pled guilty to one count of conspiracy to induce aliens to come to the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I).  His Guidelines calculations, which included an enhancement for intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person, resulted in a sentencing range of 24 to 30 months.

Judge Jose Martinez presided over the sentencing hearing held on February 11, 2009 in the Southern District of Florida.  He imposed an 18-month sentence of imprisonment, to run consecutively to a 24-month sentence—earlier imposed by

---

[1] On February 3, 2008, the Coast Guard interdicted another vessel off the Florida Keys carrying 30 Cuban nationals and two suspected smugglers.  Defendant was considered a participant in this incident for purposes of his subsequent sentencing for the June 2005 incident, although he was not held accountable for the number of aliens on board that vessel.

Judge Michael Moore, for later-occurring alien smuggling activity[2]—and to be followed by a three-year term of supervised release.

### 2.    December 21, 2005 Attempt to Smuggle Aliens

On December 21, 2005, only six months after the above June 2005 interdiction referenced above, Defendant was again captaining a boat that the Coast Guard observed to be "grossly overloaded" and that it interdicted near Key Largo, Florida.  Turned out this boat had 36 Cuban nationals on board, ten of whom were minors.  The Coast Guard had previously encountered this vessel near the Bahamas in 2005, and identified it as belonging to the "Javier/Leonardo" smuggling ring.  The owner of the vessel told Coast Guard investigators that Defendant and Cabrera had borrowed the vessel to go cruising when they sighted and rescued some Cuban nationals from a sinking boat.  The vessel owner further admitted that another vessel owned by him had been seized by the authorities when it had also been found transporting Cuban nationals.  Defendant was interviewed and released.  Later, in August 2006, he was ordered removed, but that never occurred and he was instead released on an order of supervision.

On February 26,  2009, over three years after the above December 2005 interdiction and two weeks after the sentencing for Defendant's role in the June

---

[2] Notably, the sentencing for this June 2005 smuggling attempt, which was Defendant's earliest known smuggling attempt, occurred after the June 2008 sentencing before Judge Moore for a later smuggling arrest in January 2007.  At that June 2008 sentencing, Judge Moore imposed a 24-month sentence on Defendant.

6

2005 interdiction, Defendant pled guilty to this December 2005 conspiracy to encourage and induce aliens to enter the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I). On the same day as his guilty plea, Defendant was sentenced by Judge James Lawrence King to 30 months' imprisonment, to run concurrently to his previous two consecutive sentences totaling 42 months, followed by a three-year term of supervised release.

### 3.    January 7, 2007 Interdiction

A little over a year after the December 2005 interdiction referenced above, on January 7, 2007, the Coast Guard again interdicted a vessel piloted by Defendant off the coast of the Florida Keys, heading from the Bahamas. Onboard this undocumented and unregistered vessel were 29 Cuban nationals and two suspected alien smugglers: Defendant and Erisbel Castro Cosme. Responding to questioning by ICE agents, Cosme and Defendant maintained that they were on a fishing trip and, by happenstance, had come upon and rescued these 29 Cuban nationals from a sinking boat.

Apparently, this third time was the charm or, from Defendant's point of view, the bane, as he was finally formally charged with alien smuggling and illegal reentry. Charges based on the earlier alien smuggling attempts in June 7 and December 21, 2005 were subsequently filed by the Government.

7

In February 2008, Defendant pled guilty to two counts arising from the January 2007 smuggling attempt:  one count of conspiracy to induce aliens to enter the United States and one count of illegal reentry, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) and 8 U.S.C. § 1326(a), respectively.  Pursuant to a plea agreement, the Government dismissed 29 related counts.  Pertinent to later charges concerning Defendant's own immigration status, the Presentence Investigation Report ("PSR") also noted that, based on two of his earlier arrests for alien smuggling, Defendant had been ordered removed from the country, but was nevertheless released on an order of supervision.

As this was the first sentencing hearing, albeit the Defendant's last arrest in this series of interdictions, Defendant's guidelines range was only 18 to 24 months. On June 24, 2008, Judge K. Michael Moore sentenced him to 24 months' imprisonment on each count, to run concurrently, followed by a three-year term of supervised release.

**B.    October 23, 2013 Arrest, Supervised Release Revocation, and Conviction**

### 1.    October 23, 2013 Arrest

As noted, Defendant's total sentence for the above three convictions for alien smuggling was 42-months imprisonment.  His term of supervised release began upon his release from custody on August 21, 2011.  In October 23, 2013, however, he was again arrested on suspicion of smuggling aliens.  According to an

8

affidavit of Coast Guard Senior Patrol Agent James Hawkins, Defendant and an accomplice, Yalian Puebla-Vasquez, were observed dropping off a large number of Cuban nationals on a Bahamian island. The vessel then traveled in the direction of the Florida Keys, where it was interdicted by the Coast Guard, "less than 10 minutes away from . . . crossing into the United States." The Coast Guard apprehended Defendant and Vasquez and took them to the Marathon Border Patrol Station. Under questioning, Defendant first maintained that he was on a fishing trip, but when presented with a photograph of his vessel containing the passengers, he stated only that, "I left Miami, I was returning to Miami and I was in the Bahamas." Later, authorities were able to make contact with the 33 passengers, some of whom were minors, who had been dropped off by Defendant and Vasquez. Defendant and Vasquez had left them on this uninhabited island with no food or water.

### 2.    Supervised Release Revocation Proceedings

As a result of this arrest, and before an indictment was ever returned based on the events leading to this 2013 arrest, the Probation Office filed three identical petitions (one for each prior conviction and sentence) to begin revocation proceedings. These three petitions were subsequently consolidated. The petitions alleged three violations of Defendant's supervised release: alien smuggling, illegal reentry, and leaving the Southern District of Florida without permission.

9

Defendant denied that he had engaged in alien smuggling or had illegally reentered the United States, but he was prepared to admit that he had left the district without permission. By agreement with the Government, the alien smuggling and illegal reentry violations were dropped as grounds for revocation of supervised release, in exchange for Defendant's agreement not to contest the remaining violation of leaving the district without permission.

Because he had different criminal history categories for each of his prior convictions, given the different times at which he was sentenced, Defendant's advisory guidelines ranges for the revocations varied from 3 to 9 months on the first conviction (criminal history category I), 4 to 10 months on the second conviction (criminal history category II), and 5 to 11 months on the third conviction (criminal history category III). *See* U.S.S.G. § 7B1.4(a), p.s. The statutory maximum sentence for each violation was 24 months. *See* 18 U.S.C. § 3583(e)(3).

The consolidated revocations petitions were assigned to Judge Michael Moore, who held a revocation hearing in February 2014. The court was advised that the alien smuggling and illegal reentry violations had been dismissed, leaving only the violation of leaving the district without permission. Defendant admitted to the court that he had left the district without permission, which constituted a sufficient ground for revoking Defendant's supervised release. The court inquired

10

whether Defendant was contesting the fact that he had been arrested for alien smuggling. Defense counsel conceded that he had been arrested, and the district court stated that it would "adjudicate him guilty of that."

In terms of the facts that the court could properly consider in imposing sentence, Defendant's counsel took pains to emphasize from the outset that being arrested for an offense was not the same thing as proof that one was guilty of the offense, noting, "This case is not about alien smuggling. It is not about illegal reentry. If, in fact, there is to be an alien smuggling/illegal reentry case and whatever the result is of that matter, that is for another court on another day." Defendant's counsel made clear that the arrest for alien smuggling "remains an allegation and that is all it is at the present time."

The district court expressed skepticism at the notion that the violation of leaving the district should be "looked at . . . in a vacuum without the context [of the arrest for alien smuggling]." The court stated that it had "received the amended Report and Recommendation for a final revocation hearing and it set forth a fact pattern here, and for sentencing purposes I think the guidelines provide that the Court may consider information from a variety of sources."[3] As for Defendant's contention that the violations that had been dismissed were for another court on

_____

[3] This Report and Recommendation draws from Agent Hawkins' affidavit regarding the facts underlying the arrest following the October 23, 2013 abandonment of the 33 Cuban nationals on an uninhabited island.

11

another day, the district court expressed uncertainty that Defendant would ever be prosecuted on the charge, stating that it "really [did not] know what the Government will do with respect to this law violation in terms of any future Indictment . . ."

After defense counsel's objection to the court's consideration of Defendant's suspected alien smuggling, reiterating that it was only an allegation at that time, the court acknowledged that it would be appropriate to consider Defendant's alleged smuggling of aliens only if that charge were proved "[b]y a preponderance of the evidence."  At that point, the court orally recited the facts asserted in the affidavit of Agent Hawkins describing the details of Defendant's apprehension and arrest on October 23, 2013.  Further, the district court noted that, although no indictment had yet been returned, United States Customs and Border Patrol, the Department of Homeland Security, and the United States Attorney's Office were still investigating the alleged alien smuggling and illegal reentry.

The court then queried defense counsel, "Now, are you telling me that I cannot consider that information?"  Defense counsel responded that the affidavit constituted double hearsay because the writing agent had not been on the scene. Further, while he agreed that the court could consider hearsay, the hearsay had to be reliable, which defense counsel argued was not the case here as the court was merely summarizing a Coast Guard report and Agent Hawkins had not been

12

personally present for any of the events he described.  Further, counsel noted that he not had any opportunity to question any of the people who had made the observations recited in the report.  *See* Fed. R. Crim. P. 32.1(b)(2)(C) (providing opportunity at revocation hearing to "question any adverse witness").  Finally, he noted that the facts contained in the affidavit were not necessarily inconsistent with an inference that these Cuban nationals had been found, not transported, by the Defendant.

Acknowledging Defendant's point, the court then asked if it could at least consider the fact of the arrest as evidence that Defendant left the district, which Defendant's counsel agreed that it could.  Thus, with defense counsel's acquiescence, the court decided that it could consider the fact that Defendant was out of the district in violation of his supervised release and that he had been arrested for alien smuggling while out of the district.  Defendant's counsel immediately reemphasized, however, that it was the Government's burden to prove the alien-smuggling conduct underlying the arrest if the court indeed wished to consider that fact in imposing sentence.  The court finally agreed that it would consider only the fact of arrest, not that Defendant was actually guilty of the smuggling conduct for which he was arrested.

For its part, the Government made clear that while it had dismissed the other violations, they were still under investigation, and that it "can't make any

representations today about what will happen with that investigation." Although recognizing that for purposes of the violation for leaving the district, it did not matter where Defendant had gone, the Government pointed out that Defendant "was found in international waters. And even with the representation that he was out there fishing, he has a history of getting into trouble when he goes out into international waters." That fact "show[s] a high risk of future felonious conduct because he is out in international waters where he has gotten into trouble in the past." The Government recommended "a middle-of-the-guideline range" consecutive sentences for each the three supervised release violations, to total 18 months.

The court agreed that consecutive sentences were appropriate, but also indicated its belief that an upward variance from the guideline range was in order. The court explained its decision that an upward variance was warranted:

> [A]fter three convictions and three sentences, [Defendant] has simply shown utter contempt and disrespect for the laws of the United States. Having come to the United States approximately 10 years ago—and a portion of that time having been spent incarcerated on alien smuggling cases, apparently that period of incarceration, including a sentence that was concurrent to his earlier sentences . . . *he is unable or appears to be unable or unwilling to conform his behavior to the requirements of the law in this country that this kind of smuggling activity is prohibited.* And he just doesn't seem to get that message. He didn't get the message when he got 24 months, he didn't get the message when he got 18 months, and he didn't get the message when he got 30 months concurrent.

14

With that, the court sentenced Defendant to a 24-month sentence of imprisonment on each of the three cases, to run consecutively, for a total of 72 months. The district court also imposed three concurrent 12-month terms of supervised release. Counsel objected to the reasonableness of the sentence, particularly "in light of the one violation."

### 3.    Conviction and Sentencing for Illegal Reentry

Following the revocation hearing arising out of the October 23, 2013 arrest, Defendant was eventually indicted on one count of attempted illegal reentry, in violation of 8 U.S.C. §§ 1326(a) and (b)(2). Because Defendant had outstanding orders of removal, and thus, had "self-deported" from the United States in travelling into international waters, the Government alleged that, by motoring back toward Florida from the Bahamas, Defendant had attempted to illegally reenter the United States.[4]

Defendant went to trial on this one charge before Judge Jose Martinez, and a jury found him guilty of attempted illegal reentry. Defendant had an offense level of 24 and was in criminal history category V, which yields a guidelines range of 92

---

[4] The Government acknowledged that it had not pursued an alien smuggling charge, presumably because the Cuban immigrants were left in the Bahamas before Defendant's return to Florida, but it noted that the evidence it offered at trial was "tantamount to proving alien smuggling." The trial court later surmised that the Government did not pursue the alien smuggling charge because, instead of brining his Cuban passengers to the United States, Defendant had dropped them off in Bahamian territory and "maybe that was his plan . . . to leave them there all along."

15

to 115 months.  The Government recommended a 115-month sentence, to run consecutively to the sentence imposed by Judge Moore on the supervised release violation.  The court instead sentenced Defendant to 92 months imprisonment to be served consecutively to the sentences imposed by Judge Moore, followed by a three-year term of supervised release.[5]  In imposing the sentence, the court noted that Defendant had not only repeatedly flouted the laws of the United States, but had engaged in very dangerous conduct that showed his abject disregard for the lives and safety of the Cuban migrants, and that he had done so solely to make money.

Defendant has filed a notice of appeal to this Court concerning his conviction and sentence, but that matter is not before us today.

## II.    DISCUSSION

On this appeal, Defendant challenges the procedural and substantive reasonableness of the six-year sentence imposed for violation of his supervised release conditions.  Because we conclude that the district court erred procedurally, we reverse without the need to consider whether the sentence imposed would have been substantively reasonable had there been no procedural error.

---

[5]  The advisory policy statements in Chapter 7 of the Sentencing Guidelines indicate that consecutive sentences are appropriate where the defendant is sentenced for both the violation of supervised release and the underlying criminal conduct.  *See* U.S.S.G. § 7B1.3(f); *see also* U.S.S.G. Ch. 7, Pt. B, intro. comment. ("It is the policy of the Commission that the sanction imposed upon revocation is to be served consecutively to any other term of imprisonment imposed for any criminal conduct that is the basis of the revocation.").

16

Defendant argues that his sentence was procedurally unreasonable because the district court considered his arrest for alien smuggling in deciding upon an appropriate sentence, after having told counsel that it would not do so. We set out the standards applicable both generally to sentencing proceedings and, specifically, to supervised release proceedings.

We review the sentence imposed upon revocation of supervised release for reasonableness. *United States v. Velasquez Velasquez*, 524 F.3d 1248, 1252 (11th Cir. 2008). The party challenging a sentence bears the burden of establishing that the sentence is unreasonable. *United States v. Tome*, 611 F.3d 1371, 1378 (11th Cir. 2010). If the sentence is within the Guidelines range, "the appellate court may, but is not required to, apply a presumption of reasonableness." *Gall v. United States*, 552 U.S. 38, 51 (2007). "A sentence may be procedurally unreasonable if the district court improperly calculates the Guidelines range, treats the Guidelines as mandatory rather than advisory, fails to consider the appropriate statutory factors, *selects a sentence based on clearly erroneous facts*, or fails to adequately explain the chosen sentence." *United States v. Gonzalez*, 550 F.3d 1319, 1323 (11th Cir. 2008) (per curiam) (emphasis added). In sentencing the defendant, a district court "must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Gall*, 552 U.S. at 46. The court "must 'consider the extent of the

17

deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'"  *United States v. Williams*, 526 F.3d 1312, 1322 (11th Cir. 2008) (quoting *Gall*, 552 U.S. at 50).

We generally assess the reasonableness of a sentence under an abuse of discretion standard.  *Gall*, 552 U.S. at 41; *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008).  This standard likewise applies to a district court's decision to exceed the sentencing range in Chapter 7 of the Sentencing Guidelines governing supervised release revocations.  *United States v. Brown*, 224 F.3d 1237, 1239 (11th Cir. 2000), *abrogated in part on other grounds as recognized in United States v. Vandergrift*, 754 F.3d 1303, 1309 (11th Cir. 2014).

As to the evidentiary standard applicable to revocation proceedings, the Supreme Court has long held that revocation proceedings, although not governed by the due process standards of trials, do have some due process requirements.  *See Morrissey v. Brewer*, 408 U.S. 471, 489 (1972) (parole revocation); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (probation revocation); *see also United States v. Frazier*, 26 F.3d 110, 114 (11th Cir. 1994) (supervised release revocation).  Importantly, a district court may revoke a defendant's supervised release and impose a term of imprisonment only if it finds by a preponderance of the evidence that the defendant violated a condition of his supervised release.  18 U.S.C. § 3583(e)(3); *see also Johnson v. United* States, 529 U.S. 694, 700 (2000) (for

18

supervised release revocations, "the violative conduct need not be criminal and need only be found by a judge under a preponderance of the evidence standard . . .); *United States v. Cunningham*, 607 F.3d 1264, 1268 (11th Cir. 2010) ("the violation of supervised release need only be proven by a preponderance of the evidence . . .").

After it has determined by a preponderance of the evidence that there has been a violation of supervised release, the district court must consider the now-familiar factors[6] set out in 18 U.S.C. §§ 3553(a)(1), 3553(a)(2)(B-D), and 3553(a)(4-7) in crafting the sentence. 18 U.S.C. § 3583(e). In applying these § 3553 considerations to craft a sentence, "[f]ederal law places no limitation on the information which a court can consider in determining an appropriate sentence." *United States v. Rodriguez*, 765 F.2d 1546, 1554-55 (11th Cir. 1985). This ability to consider a broad array of information is supported by statute. 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate

---

[6] Section 3553(a)(1) requires the court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant". Sections 3553(a)(2)(B-D) require the court to consider the needs for deterrence and protection of the public, as well as the educational, vocational, medical, and correctional needs of the defendant. The court also must consider "the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to [28 U.S.C. §] 994(a)(3) . . ." 18 U.S.C. § 3553(a)(4)(B); *see also United States v. Silva*, 443 F.3d 795, 799 (11th Cir. 2006) (the policy statements in Chapter 7 of the Sentencing Guidelines, governing revocation, must be considered).

sentence.")  Likewise, the Sentencing Guidelines affirm the expansiveness of the information that a court may consider, but do note that any such information must have a "sufficient indicia of reliability" to support a conclusion that it is accurate. U.S.S.G. § 6A1.3(a), p.s. ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.")

Although the information the court may consider is vast, it is nonetheless "'appropriate' that facts relevant to sentencing be proved by a preponderance of the evidence."  *United States v. Watts*, 519 U.S. 148, 156 (1997) (citing U.S.S.G. § 6A1.3, comment.).  The "application of the preponderance standard at sentencing generally satisfies due process."  *Id.* (citing *McMillan v. Pennsylvania*, 477 U.S. 79, 91-92 (1986)); *see also United States v. Faust*, 456 F.3d 1342, 1348 (11th Cir. 2006) ("under an advisory Guidelines scheme, courts can continue to consider relevant acquitted conduct so long as the facts underlying the conduct are proved by a preponderance of the evidence . . . ").

Under this evidentiary standard, the court "may not speculate about the existence of a fact that would result in a higher sentence," but must only consider "reliable and specific evidence."  *United States v. Barrington*, 648 F.3d 1178, 1197

20

(11th Cir. 2011); *see United States v. Shaw*, 560 F.3d 1230, 1237 (11th Cir. 2009) (explaining that the district court set out the facts that it was relying upon in varying upward from the guidelines range, and that those facts were acknowledged by the defendant). With regard to hearsay evidence, "[w]hile [it] may be considered in sentencing, due process requires both that the defendant be given an opportunity to refute it and that it bear minimal indicia of reliability." *United States v. Giltner*, 889 F.2d 1004, 1007 (11th Cir. 1989) (citing *Rodriguez*, 765 F.2d at 1555). "These protections apply not just to hearsay testimony but also to any information presented at sentencing." *Id.* (citing *United States v. Saintil*, 753 F.2d 984, 990 (11th Cir. 1985), *cert. denied*, 472 U.S. 1012 (1985)). Unadmitted or unsupported assertions of fact may not be relied upon as evidence. *United States v. Washington*, 714 F.3d 1358, 1361-62 (11th Cir. 2013). Thus, "'evidence presented at the trial or sentencing hearing . . . may not—*without more*—be used to fashion a defendant's sentence if the defendant objects . . . [W]here the defendant has not had the opportunity to rebut the evidence or generally to cast doubt upon its reliability, he must be afforded that opportunity.'" *Id*. at 1362 (brackets removed) (quoting *United States v. Castellanos*, 904 F.2d 1490, 1496 (11th Cir. 1990) (emphasis in original)).

Having set out the applicable standards, we now boil the above principles down to those that are important in deciding this case. First, in fashioning a

21

sentence, a court is not limited to looking at only the violation that is the basis for revocation of the defendant's supervised release (here, leaving the district without permission). Instead, a court can consider any other conduct that is relevant to determining a reasonable sentence, even criminal acts that are not the basis of the revocation proceeding and even conduct that may not even be criminal. Thus, in deciding what would be a reasonable sentence here, the court could have properly considered whether Defendant had once again engaged in the smuggling of illegal aliens. (Or, if Defendant had actually abandoned these Cuban nationals to an uninhabited island, without food or water, whether he had done something even worse than alien smuggling.)

But to consider such conduct, the latter would have to be proved by a preponderance of the evidence. Moreover, in deciding whether this conduct had been proved, the court was certainly free to consider hearsay evidence, within limits. Those limits are that the hearsay evidence bear some minimal indicia of reliability and that the defendant be given the opportunity to refute it.

Here, that process did not occur as it should have. Defense counsel repeatedly questioned the reliability of the agent's affidavit and indicated that, were the court to consider that affidavit, he would seek the right to question the agent. After a lot of back-and-forth between the court and counsel, the court eventually indicated, essentially, that, in imposing sentence, it would not consider

22

that Defendant may have once again attempted to smuggle aliens into our country. This acknowledgement was in response to counsel's repeated reminders that an arrest was not the same of evidence of guilt and that, at this early juncture, the Government had not yet marshaled its evidenced—reliable or otherwise—in an effort to prove the smuggling conduct. After this repeated give-and-take with counsel, the court agreed that the conduct admitted by Defendant—that he was out of the district and that he had been arrested for alien smuggling—was "all we'll consider."

Yet, even though this is what the court said, it is apparent that, in sentencing Defendant, the judge had concluded that Defendant did actually engage in the smuggling of aliens and that he gave great weight to this fact in deciding on the appropriate sentence. Specifically, the district court remarked about Defendant:

> [H]e is unable or appears to be unable or unwilling to conform his behavior to the requirements of the law in this country that this kind of smuggling activity is prohibited. And he just doesn't seem to get that message. He didn't get the message when he got 24 months, he didn't get the message when he got 18 months, and he didn't get the message when he got 30 months concurrent.

In this comment, the district court directly referenced the smuggling activity that was foremost in his mind. And, by noting that, having been sentenced somewhat leniently three times before for human smuggling activities, Defendant still had not gotten the message that this kind of conduct would not be tolerated, the court made clear the importance of this conduct to its ultimate sentencing decision.

23

Whether or not the Coast Guard officer's affidavit relied on by the court constituted sufficient evidence, under a preponderance standard, to infer that Defendant had transported these Cuban nationals to the Bahamian island, the fact remains that Defendant was not given an opportunity to contest the reliability of that evidence.   For that reason, we conclude that the district court committed a procedural error.  *Cf. Gonzalez*, 550 F.3d at 1323 (a sentence is procedurally unreasonable if the court "selects a sentence based on clearly erroneous facts….").

Because we conclude that the court committed a procedural error, we do not reach the question whether the court's sentence would have been substantively reasonable had Defendant been properly proved to have engaged in new smuggling activity.  We therefore remand for a new sentencing hearing at which the district court shall allow Defendant the opportunity to contest any information that the court is considering as a sentencing factor and at which the court shall consider only such conduct as is proved by a preponderance of reliable evidence.

## III.   CONCLUSION

For the above reasons, we **VACATE** the sentence imposed upon Defendant in the supervised release revocation hearing before us and **REMAND** for the court to conduct a new sentencing hearing.

24